**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MII Aviation Services LLC, *et al.,* | Case No. 26-10123 (LSS) |
| Debtors.[1] | (Jointly Administered) |
| | **Bidding Procedures Hrg. Date: June 23, 2026, at 10:00 a.m. (ET)**<br>**Bidding Procedures Obj. Due: June 16, 2026, at 4:00 p.m. (ET)** |

**DEBTORS' MOTION PURSUANT TO SECTIONS 105, 363, AND 365 OF THE
BANKRUPTCY CODE FOR ENTRY OF AN ORDER (A)(I) APPROVING
THE BIDDING PROCEDURES FOR THE SALE OF DEBTORS' ASSETS,
(II) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO
THE SALE, (III) SCHEDULING BID DEADLINES AND AN AUCTION,
(IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
(V) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES FOR
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (VI) AUTHORIZING AND
APPROVING THE DEBTORS' ENTRY INTO THE STALKING HORSE APA,
(VII) AUTHORIZING AND APPROVING BID PROTECTIONS, AND
(VIII) GRANTING RELATED RELIEF AND (B)(I) APPROVING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
AND (III) GRANTING RELATED RELIEF**

MII Aviation Services LLC and its affiliated debtors and debtors in possession (each, a

"Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases, by and through

their undersigned counsel, hereby submit this motion (this "Motion")[2] for entry of orders granting

the relief described below.  In support hereof, the Debtors represent as follows:

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: MII Aviation Services LLC; and Michal International Investment LLC (0813).  The Debtors' service address is c/o Arbel Capital Advisors, Attn: Daniel Sasson, 4 Waverly Place, Lawrence, NY 11559.

[2]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Bidding Procedures Order (as defined herein), the First Day Declaration (as defined herein), the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 70] (the "DIP

## BACKGROUND

1.      On February 1, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

2.      On February 16, 2026, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in these chapter 11 Bankruptcy Cases.  See [Docket No. 22].

3.      Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Boaz Toshav in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 25] (the "First Day Declaration"), which is incorporated herein by reference.

4.      As set forth in the First Day Declaration and the *Declaration of J. R. Manning* (the "Manning Declaration") filed concurrently herewith in support of this Motion, the Debtors filed the Chapter 11 Cases to effectuate a sale (the "Sale") of all or substantially all of their assets, including any and all rights, claims, and causes of action, and all of the issued and outstanding equity interests of certain non-debtor entities (collectively, the "Assets") to maximize value for all stakeholders.

---

Motion"), or the *Debtors' Supplement to Motion Seeking Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* [Docket No. 189] (the "Supplemental Motion").

5.      The timeline set forth in the Bidding Procedures, attached as <u>Exhibit 1</u> (the "<u>Bidding Procedures</u>") to the Bidding Procedures Order (as defined below) is reasonable under the circumstances of these chapter 11 cases.   The timeline for the Bidding Procedures takes into account the *Agreed Scheduling Order Regarding Cash Collateral Matters*, signed on May 7, 2026, by the Court [Docket No. 204] (the "<u>Scheduling Order</u>").   By this Motion, the Debtors seek the Court's approval of Bidding Procedures pursuant to which they will seek bids for the Sale of all or substantially all of the Debtors' Assets and, subsequently, a Sale of the Assets to the Stalking Horse Purchaser or such other purchaser selected by the Debtors as the successful bidder with respect to the Assets in accordance with the Bidding Procedures.   The proposed Bidding Procedures are designed to facilitate an open, transparent and competitive process to determine the ultimate value of the Debtors' estates and will inure to the benefit of all the Debtors' creditors. Moreover, with these Bid Procedures the Debtors will seek to further market-test the Stalking Horse bid with the goal of attracting a higher or otherwise better bid(s).   As described below, the Bidding Procedures are designed to sell the Debtors' Assets which comprise of two sets of assets: (i) MII's assets as set forth on Schedule I (the "<u>MII Assets</u>") and (ii) MII Aviation's assets as set forth on Schedule II (the "<u>MII Aviation Assets</u>").   As a part of the sales process, the Debtors will also solicit proposals on the individual investments within the MII Assets to see if there is a superior "sum-of-the-parts" solution to test the market.

6.      The Debtors believe it is critical that the sale process be consummated in an expeditious manner to maximize value by selling the Assets and curtail professional fees and administrative costs.  If the Bidding Procedures are not approved or there is any material delay to the proposed timeline, the Debtors' ability to maximize value for the benefit of all stakeholders will be jeopardized.

7.      The Bidding Procedures and the related relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors request that this Court grant this Motion.

## JURISDICTION AND VENUE

8.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.

9.      Pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).   Venue of the Chapter 11 Cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

11.     The statutory bases for the relief requested herein are sections 105, 363, and 365 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Local Rules 2002-1 and 6004-1.

## RELIEF REQUESTED

12. The Debtors seek entry of an order approving, among other things, the Bidding Procedures, in substantially the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), which:

(a) authorizes and approves the Bidding Procedures, attached to the Bidding Procedures Order as **Exhibit 1**;

(b) authorizes the Debtors to enter into the Stalking Horse APA (as defined below) upon finalization on terms set forth in the term sheet attached hereto as **Exhibit B** (the "Term Sheet");

(c) approves the form and manner of notice of the proposed Sale of Assets, the Term Sheet and the Stalking Horse APA, the Bidding Procedures, the Auction (as defined below), and the Sale Hearing (as defined below), attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice"), and the notice of Successful Bidder, attached to the Bidding Procedures Order as **Exhibit 3**;

(d) approves procedures for the assumption and assignment of the Purchased Contracts (as defined in the Bidding Procedures Order) in connection with any sale, and approves the form and manner of the notice thereof, attached as **Exhibit 4** to the Bidding Procedures Order (as defined below);

(e) approves the Breakup Fee and Expense Reimbursement (each as defined herein);

(f) schedules certain dates with respect thereto;

(g) grants authority to sell certain de minimis assets in order to effectuate the Sale; and

(h) grants related relief.

13. The Debtors will seek entry of a sale order (the "Sale Order") at the Sale Hearing (as defined below), which the Debtors will file in advance of the Sale Hearing. The proposed Sale Order will, among other things:

(a) authorize and approve the Sale to the Stalking Horse Purchaser (as defined below) or otherwise Successful Bidder (as defined in the Bidding Procedures), on the terms substantially set forth in the Successful Bid (as defined in the Bidding Procedures);

(b) authorize and approve the Sale of the Assets free and clear of any claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, statutory or deemed trust, and deed of trust or other encumbrance to the extent set forth in the asset purchase agreement with the

Successful Bidder, attached to the Sale Order, which may be the Stalking Horse APA;

(c) authorize and approve the assumption and assignment of the Purchased Contracts to the Successful Bidder; and

(d) grant related relief.

14. The Debtors will file declarations or other evidence in support of the Sale in advance of the sale hearing (the "Sale Hearing") to approve the Successful Bid and any Backup Bid (as defined below) (or if no Acceptable Bid (as defined below) other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA).

## THE PROPOSED SALE

**I.      The Prepetition Marketing Process.**

15. On January 2, 2026, the Debtors engaged Silver Birch Group, Inc. and BA Securities, LLC (collectively, "SBG") to serve as their investment banker to begin exploring strategic alternatives to address upcoming debt maturities and liquidity constraints. Upon its retention, SBG immediately began conducting due diligence with respect to the Assets and the Debtors' operations. Subsequent to its initial assessment of alternatives and timing of a marketing process, SBG began marketing preparations, including determining market interest in a potential sale of the Debtors' businesses and assets.

16. As part of the proposed postpetition sale process, the Debtors, through SBG and their other professionals, will continue their marketing efforts with respect to the Debtors' Assets, including contacting both financial and strategic investors regarding a potential sale, including all parties contacted prior to the commencement of the Chapter 11 Cases. The postpetition sale process is designed to permit the Debtors to sell, separately or in combination, the MII Assets, the MII Individual Asset(s), or the MII Aviation Assets. Any interested parties will be given an opportunity to execute a non-disclosure agreement and be given access to the data room. Those

parties that execute a non-disclosure agreement will be provided with substantial due diligence information concerning, and access to, the Debtors, including, without limitation, presentations by the Debtors and their advisors, and access to financial, operational, and other detailed information.

**II.    The Proposed Schedule.**

17.    Pursuant to the Bidding Procedures, the Debtors will solicit the highest or otherwise best proposals according to the following proposed schedule, subject to Court approval and availability (the "Sale Timeline"):

| Date | Event or Deadline | |
|---|---|---|
| Entry of Bidding Procedures Order | June 23, 2026 | Date for the approval of the Bidding Procedures. |
| Non-Binding Bid Deadline | July 24, 2026 | Deadline for when the Debtors must *actually receive* non-binding bids from parties. |
| Bid Deadline | August 7, 2026, at 5:00 p.m. (E.T.) | Deadline for when the Debtors must *actually receive* binding bids from parties. |
| Auction (If Necessary) | August 11, 2026 | Date for when an auction for the Assets (the "Auction") will be conducted, if necessary. The Auction will be conducted in-person at the Delaware office of Chipman, Brown, Cicero & Cole, LLP or via remote video at the Debtors' election. |
| Sale Transaction Objection Deadline | August 13, 2026, at 4:00 p.m. (E.T.) | Deadline by which general objections to the sale must be filed with the Court and served so as to be actually received by the appropriate notice parties (the "Sale Transaction Objection Deadline"). |
| Sale Order Hearing | August 19, 2026 (or such date as the Court provides for the hearing) | Date for the hearing to consider the approval of the Sale Order. |
| Closing Date | August 27, 2026, and outside closing date is September 24, 2026 | Outside deadline for closing of the sale (or sales) of the assets of the Debtors. |

18.     The Debtors believe that this timeline balances the need for as thorough a marketing process as the Debtors' circumstances will permit to maximize value with the need to proceed expeditiously, as required under the practicalities facing the Debtors, including the cost of the Chapter 11 Cases.   In addition to the Debtors' marketing efforts thus far, the Debtors will use the time prior to, and after, entry of the Bidding Procedures Order to actively market the Assets to expedite the solicitation of bids for the Debtors' Assets in advance of the deadline for interested parties to submit bids for the Debtors' Assets (the "Bid Deadline").   In light of the foregoing, the Debtors have determined that the proposed schedule is in the best interests of the Debtors' estates, assists in establishing whether and to what extent a market exists for the Assets, and provides interested parties with sufficient opportunity to participate in any sale transaction(s). Such schedule will, in the Debtors' business judgment, result in the highest or otherwise best bid for the Assets under the circumstances.

**III.     The Bidding Procedures.**

19.     To solicit, receive, and evaluate bids optimally and expeditiously and in a fair and efficient manner, the Debtors request that the Court approve the proposed Bidding Procedures.[3]   The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the Debtors' Assets, consistent with the Debtors' goal of implementing a cost-effective Sale.

20.     The Bidding Procedures will provide potential bidders with ample notice and time to conduct thorough due diligence that will enable such potential bidders to submit binding bids in

---

[3]   This summary is qualified in its entirety by the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

advance of the Sale Hearing.  The Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward, effectuate an expeditious sale process with minimal disruption, and create a path towards entry of the Sale Order that will secure the highest or otherwise best value for the Debtors' Assets and business.  The proposed Bidding Procedures are in the best interests of all stakeholders and should be approved.

21.     The Debtors also request authority, as set forth in the Bidding Procedures Order, to enter into the Stalking Horse APA with the Stalking Horse Purchaser.  The Stalking Horse APA will provide the Debtors with the ability to maximize the value of the Assets by setting a floor for potential bidders and encouraging potential bidders to put forth their best bid.  As noted above, the Debtors' sole secured creditor is the Stalking Horse Purchaser.  However, the Debtors understand that the Pre-Petition Secured Lender is willing to release its liens if a higher or otherwise better bid is received.  Therefore, given the Debtors' need to maximize value for creditors and other stakeholders through a timely and efficient marketing process, the Debtors' entry into the Stalking Horse APA is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

22.     Pursuant to Local Rule 6004-1(c)(i), the chart below sets forth the salient points of the proposed Bidding Procedures:

| Requirement | Description |
| --- | --- |
| **Stalking Horse Purchaser** | The Debtors are in the process of negotiating the Stalking Horse APA with the Stalking Horse Purchaser and will file the final form as soon as available.  As set forth more fully in the Term Sheet, the Purchase Price to be paid by the Stalking Horse Purchaser is:<br><br>(i)     a credit bid in the aggregate amount of US$5,000,000.00 for all of MII's Assets (the "MII Assets Bid").  The allocated value assigned to each individual asset comprising the MII Assets (each, an "Allocated Asset Value") shall be determined by the Stalking Horse Purchaser in good faith based on reasonable valuations and in consultation with the Debtors and their professionals prior to the Bid Deadline.  In the event that a Successful Bidder, other that the Stalking Horse Purchaser, is the winning bidder with |

| Requirement | Description |
|---|---|
| | respect to any individual asset or sub-set portfolio of the MII Assets (each, a "MII Individual Asset"), the Stalking Horse Purchaser's aggregate MII Assets Bid shall be automatically reduced by the Allocated Asset Value assigned to such MII Individual Asset(s).  For the avoidance of doubt, upon any such reduction, the Stalking Horse Purchaser shall have no obligation to credit bid, pay, or otherwise be responsible for any amount in excess of the sum of the Allocated Asset Values of the MII Individual Assets actually acquired by the Stalking Horse Purchaser.<br><br>(ii) a credit bid in the aggregate amount of US$5,000,000.00 for all of MII Aviation's Assets (the "MII Aviation Assets Bid").<br><br>(iii) the assumption by the Stalking Horse Purchaser of the Assumed Liabilities (including payment of the costs to cure all amounts due under any Assumed Contracts) (collectively clauses (i), (ii), and (iii) the "Purchase Price").<br><br>The Stalking Horse APA will also include various customary representations, warranties, and covenants by and from the Debtors and the Stalking Horse Purchaser, and certain conditions to closing and rights of termination related to the Sale and the Chapter 11 Cases generally.<br><br>The Stalking Horse Purchaser is deemed to be an Acceptable Bidder (as defined below), and the Stalking Horse APA shall be deemed to be an Acceptable Bid.  Subject to the Court's confirmation of the validity and amount of the Stalking Horse Purchaser's liens, the Stalking Horse Purchaser is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit (as defined below) with the Debtors. |
| **Assets to Be Sold** | MII's Assets: |

| 100% of MII's equity interests in each of the following (the "MII Assets") | Percentage Owned by Sellers |
|---|---|
| ION | 100% of LP Interest |
| Vimodo | 100% |
| Maradin (in bankruptcy in Israel) | 73.72% |
| SGP-Koolspan, Inc. | 68.459284% |
| Arineta | Series B: 4,905,154<br>Series B1: 4,450,755 shares<br>Series C: 453,361<br>Series C1: 538,366<br>Series C2: 527,162<br>Series C3: 1,436,623<br>Series C4: 2,511,617<br>Series D: 14,823,039 shares;<br>Series D SAFE: 9,169,469 shares |
| Quris | Series A Preferred Seed-1: 5,371 shares<br>Series A Preferred Seed-5: 23,743 shares |

| Requirement | Description |
|---|---|

| | MoreTech Ventures I LP and MoreTech Ventures II LP[4] | 100% of LP Interests |
|---|---|---|
| | All other holdings including any and all tax refunds, third party claims and actions (including avoidance actions) | 100% |

MII's Aviation Assets:

| 100% of MII Aviation's equity interests in each of the following (the "MII Aviation Assets") | Percentage Owned by Sellers |
|---|---|
| BEH | 100% |
| All other holdings including any and all tax refunds, third party claims and actions (including avoidance actions) | 100% |

The MII Assets and the MII Aviation Assets (collectively, the "Purchased Assets") will be sold free and clear of all interests, claims, liens, and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

The Purchased Assets include (i) all equity interests owned by each of the Sellers in the Purchased Assets, together with all rights appurtenant thereto, including all voting rights, rights to receive dividends and distributions, liquidation rights, conversion rights, preemptive rights, rights of first refusal or first offer, anti-dilution protections, and all other rights, preferences, and privileges associated with such equity interests (collectively, the "Equity Interests"); and (ii) all of Sellers' rights with respect to any and all third party actions (including avoidance actions) that may be brought by or on behalf of the Sellers.

| **Participation Requirements: Acceptable Bidders** | Any person or entity that wishes to conduct diligence about the Debtors (an "Interested Party") may request access to the Debtors' confidential electronic data room concerning the Assets (the "Data Room"). To become an Interested Party, and thus be able to conduct due diligence, an Interested Party must execute a non-disclosure agreement, in form and substance satisfactory to the Debtors, with the Debtors and submit the following documents (collectively the "Preliminary Bid Documents").

Any Interested Party that wishes to participate in the bidding process for the Assets other than in the case of the Stalking Horse Purchaser (each, a "Potential Bidder") must first become an "Acceptable Bidder." To become an Acceptable Bidder, an Acceptable Bidder must submit to the Debtors and their advisors: |
|---|---|

---

[4]  The entity is managed by its general partner, Scintilla-Tech Ltd., which is a separate and unrelated entity to Scintilla Fund LP. One of Scintilla-Tech's shareholders is Scintilla Holdings Ltd., which served as the general partner of Scintilla Fund LP until the end of 2024.

| Requirement | Description |
|---|---|
| | documentation identifying the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction; |
| | an executed confidentiality agreement on terms acceptable to the Debtors, to the extent not already executed, which confidentiality agreement shall, among other terms, contain customary provisions regarding: (i) the nondisclosure of confidential information, (ii) prohibitions on contacting third parties in connection with a transaction, (iii) covenant to not solicit employees of the Debtors, (iv) prohibitions on purchasing or otherwise acquiring the Debtors' debt and equity securities, and (v) the survival of certain provisions of the confidentiality agreement; |
| | evidence by the Potential Bidder of its sufficient financial capacity to close a proposed transaction, which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors, with the assistance of the Debtors' advisors; |
| | a statement and other factual support that the Potential Bidder has a bona fide interest in consummating a sale transaction, to the reasonable satisfaction of the Debtors after consultation with the Consultation Parties (as defined below); |
| | written disclosure of any connections or agreements with the Debtors, the Stalking Horse Purchaser, any other known Potential Bidder, or Qualified Bidder (as defined below), current or former "insiders" of the Debtors (as that term is contemplated by section 101(31) of the Bankruptcy Code), or any current or former manager or direct or indirect equity security holder of the Debtors; and |
| | documentation identifying the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated transaction. |
| | Only Acceptable Bidders may submit Bids.  Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) the Stalking Horse Purchaser shall be considered an Acceptable Bidder, and the Stalking Horse APA shall be considered an Acceptable Bid, for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser; and (ii) in determining whether the Potential Bidders constitute Acceptable Bidders, the Debtors may consider a combination of bids for the Assets. |
| **Bankruptcy Court Jurisdiction** | Any Acceptable Bidders and Qualified Bidders shall: (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any disputes relating to, actions or proceedings arising from or relating to the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents; (ii) bring any such action or proceeding in the Court; and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including |

| Requirement | Description |
|---|---|
| | any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law |
| **Due Diligence** | The Debtors will provide any Acceptable Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: (a) investment banker for the Debtors, Silver Birch Group, Inc. and BA Securities, LLC, Jeffrey R. Manning, Sr. (jrmanning@silvrbirch.com); or (b) counsel for the Debtors, Chipman Brown Cicero & Cole LLP, 1313 N. Market Street, Suite 5400, Wilmington, DE 19801 (Attn: Mark L. Desgrosseilliers; email: desgross@chipmanbrown.com). <br><br> The due diligence period shall extend through and including the Bid Deadline. The Debtors, in their business judgment, may, but shall not be obligated to, furnish any due diligence information after the Bid Deadline. <br><br> The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determines is business-sensitive or otherwise not appropriate for disclosure to an Acceptable Bidder. Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Acceptable Bidders, *provided* that such Acceptable Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors. The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Acceptable Bidders in connection with the Bidding Procedures and the Sale. |
| **Qualified Bids & Bid Requirements** | Each bid (a "Bid") submitted by an Acceptable Bidder must be submitted in writing and satisfy the following requirements (collectively, the "Bid Requirements,") unless otherwise modified by the Debtors (except for the requirement set forth in II(c) of the Bid Procedures), in their discretion: <br><br> (a) Marked Agreement. A Bid must be in writing and include an executed asset purchase agreement (a "Competing APA"), together with all exhibits and schedules (the "Transaction Documents"), pursuant to which the Acceptable Bidder proposes to effectuate the contemplated transaction, which Competing APA must be similar in form and substance to the Stalking Horse APA and be marked to reflect the differences between the Stalking Horse APA and the Acceptable Bidder's Competing APA, including, without limitation, specification of the proposed purchase price, any assumed liabilities, and any changes to any exhibits or schedules to the Competing APA. A Bid must identify with particularity each and every condition to closing and all executory contracts and unexpired leases to be assumed and assigned pursuant to the Transaction Documents. The Transaction Documents must include a commitment to close the Transaction by no later than the Closing Date provided in the Stalking Horse APA. A Bid should propose a contemplated transaction involving specific Assets. The Debtors will evaluate all Bids, in their sole discretion, subject to prior consultation with the Consultation Parties, to determine whether such Bid or combination |

| Requirement | Description |
|---|---|
| | of Bids maximizes the value of the Debtors' estates as a whole in light of any factors regarding such bid which the Debtors, in their discretion, determine are appropriate to be considered in evaluating Bids. |
| | (b) Purpose. Each Acceptable Bidder must state that the Bid includes an offer by the Acceptable Bidder to purchase some or all of the Assets and state which Assets with reasonable specificity. Each Bid must clearly identify the following: (i) contracts and leases to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof and (ii) the liabilities, if any, to be assumed. |
| | (c) The consideration proposed by a Bid may include cash or other consideration acceptable to the Debtors in an amount of no less than the sum of (i) the Purchase Price attributed to the applicable Assets, plus (ii) the Expense Reimbursement attributed to the Assets, plus (iii) the Break-Up Fee attributed to the Assets, plus (iv) an Overbid; *provided that* the Bid must include sufficient cash to pay Silver Birch Group, Inc.'s Marketing and Improvement Fees, as defined in Silver Birch Group, Inc. and BA Securities, LLC's engagement agreement dated as of January 2, 2026 (the "SBG Improvement Fee"), with respect to those Assets subject to the Bid, in addition to the Expense Reimbursement and Break-Up Fee. |
| | (d) Forms of Consideration. Each Bid must (a) indicate whether it is an all-cash offer (including confirmation that the cash component of the Bid is based in U.S. Dollars); and the liabilities to be assumed, if applicable; and (b) provide sufficient cash consideration specifically designated for the payment of the Expense Reimbursement (as defined below) and Break-Up Fee (as defined below) attributable to the Asset or Assets included in such Bid and any sale transaction fee payable to SBG. The Debtors may request that any Bid include the allocation of the Purchase Price among the MII Assets to be acquired. |
| | (e) Deposit. Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate value of the cash consideration of the Bid to be held in an escrow account to be identified and established by the Debtors (the "Deposit"); provided that that the Debtors reserve the right to increase the amount of the Deposit in their discretion, including, without limitation, the right to request an additional Deposit in the event an Acceptable Bidder increases the amount of its Bid. For the avoidance of doubt, the Stalking Horse Purchaser shall not be required to provide a Deposit. |
| | (f) Irrevocable. All Bids must be irrevocable until the Debtors' selection of the Successful Bid and Backup Bid (each as defined below); provided, however, that the Successful Bid shall be irrevocable until the closing of the Approved Transaction (as defined below) and the Backup Bid must be irrevocable in accordance with Section VI of the Bid Procedures, as applicable. |
| | (g) Committed Financing. To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Bid must include evidence of committed financing documented to the Debtors' satisfaction that |

14

| Requirement | Description |
|---|---|
|  | demonstrates that the Acceptable Bidder has received sufficient debt or equity funding commitments to satisfy the Acceptable Bidder's purchase price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.<br><br>(h) Unconditional Offer / Contingencies.  A statement that the Bid is formal, binding, and unconditional and is not subject to any further due diligence or contingencies related to financing, internal approval, due diligence, or otherwise, and is irrevocable until the Debtors notify the Acceptable Bidder that such Bid is not a Successful Bid or a Backup Bid.<br><br>(i) Non-Reliance.  A Bid must include a written acknowledgement and representation of the Acceptable Bidder that it has had the opportunity to conduct any and all due diligence regarding the applicable Assets and assumed liabilities prior to making its Bid, that it has relied solely upon its own independent review, investigation or inspection of any documents or the applicable Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the applicable Assets or the physical condition of such Assets, the assumed liabilities, or the completeness of any information provided in connection therewith or the Auction.<br><br>(j) Identity.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder, sponsor, parent company or other financial backer of the Acceptable Bidder, including if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s), counsel and other advisors whom the Debtors' advisors should contact regarding such Bid.  Nothing herein shall preclude multiple Acceptable Bidders from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein.<br><br>(k) Adequate Assurance.  Each Bid must contain evidence acceptable to the Debtors in their discretion that the Acceptable Bidder has the ability to perform thereunder and otherwise complies with the requirements of adequate assurance of future performance under sections 365(b)(1) and 365(b)(3) of the Bankruptcy Code.  Such evidence may include audited and unaudited financial statements, tax returns, bank account statements, a description of the proposed business to be conducted at the premises or any other documentation that the Debtors further request. In the event the Acceptable Bidder is determined to be the highest or otherwise best, the bidder is expected to present evidence of Adequate Assurance at the Sale Hearing. |

| Requirement | Description |
|---|---|
| | (l) <u>Authorization</u>. Each Bid must contain evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the closing of the Transaction contemplated in such Bid (including the submission, execution, and delivery of the Competing APA). |
| | (m) <u>No Fees Payable to Bidder</u>.  Except with respect to the Break-UP Fee and Expense Reimbursement payable to the Stalking Horse Purchaser in accordance with the Stalking Horse APA, a Bid may not request or entitle the Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue any break-up fee, termination fee, expense reimbursement or similar type of payment, or substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bidding Procedures. |
| | (n) <u>No Collusion</u>. An affirmative statement that the Acceptable Bidder did not engage in any collusion with any other party, entity, or individual. |
| | By submitting its Bid, each Acceptable Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bidding Procedures and to refrain from submitting a Bid or seeking to reopen any round of bidding or the Auction after conclusion of any round of bidding or the Auction. **The submission of a Bid shall constitute a binding and irrevocable offer to acquire the applicable Assets as reflected in such Bid.** |
| | Notwithstanding anything herein to the contrary and for the avoidance of doubt, for all purposes under the Bidding Procedures, the Stalking Horse APA submitted by the Stalking Horse Purchaser is a Qualified Bid without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser. |
| **Bid Deadline** | An Acceptable Bidder, other than the Stalking Horse Purchaser, that desires to make a binding Bid shall transmit such proposal, solicitation, or offer via email (in pdf or similar format) to the Debtors and the Debtors' advisors so as to be received on or before **August 7, 2026, at 5:00 p.m. (E.T.)** (the "<u>Bid Deadline</u>"). A Bid must be received no later than the Bid Deadline, unless otherwise extended by the Debtors in their sole discretion after consultation with the Consultation Parties.  To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of the Chapter 11 Cases indicating the same. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.** |

| Requirement | Description |
|---|---|
| **Designation of Acceptable Bidders** | A Bid will be considered a "Qualified Bid," and each Acceptable Bidder that submits a Qualified Bid will be considered a "Qualified Bidder," if the Debtors determine, in their discretion, subject to prior consultation with the Consultation Parties, that such Bid:<br><br>(a) satisfies the Bid Requirements set forth above; and<br><br>(b) is reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors.<br><br>The Debtors will notify each Qualified Bidder whether such party is a Qualified Bidder and shall provide the Notice Parties (as defined below) with a copy of each Bid that has been submitted to the Debtors (whether or not such bid has been determined by the Debtors to be a Qualified Bid).<br><br>If any Bid is determined by the Debtors not to be a Qualified Bid, a Prequalified Bidder who submits a bid not determined to be a Qualified Bid, will have until **5:00 p.m. (ET) on August 8, 2026**, to resubmit a bid to qualify, and the Debtors reserve the right to work with any Acceptable Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid. The Debtors will refund such Acceptable Bidder's Deposit on the date that is the date on which the Debtors make a final determination that such Bid is not a Qualified Bid or as soon thereafter as is reasonably practicable.<br><br>Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Acceptable Bidder's purchase price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein; provided, further, that the Stalking Horse Bid may be modified or amended pursuant to its terms. Any improved Qualified Bid must continue to comply in all respects with the requirements for Qualified Bids set forth in these Bidding Procedures.<br><br>Notwithstanding anything herein to the contrary and for the avoidance of doubt, for all purposes under the Bidding Procedures, the Stalking Horse Purchaser is a Qualified Bidder without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser. |

| Requirement | Description |
|---|---|
| **Right to Credit Bid** | Subject to a resolution on a potential Challenge and subject to the Challenge Deadline (as each is defined in the Supplemental Motion), Scintilla is permitted to credit bid any of its claims against the Debtors, in accordance with section 363(k) of the Bankruptcy Code in any sale of the Assets, and may assign such right to credit bid in whole or in part to any of its affiliates.  In the event that (a) the Challenge Deadline has expired without the filing of a Challenge, or (b) a Challenge has been filed and resolved favorably for Scintilla by the Bid Deadline, Scintilla, or its permitted assignee(s), shall have the right to credit bid on a dollar-for-dollar basis up to the full allowed amount of Scintilla's claims pursuant to section 363(k) of the Bankruptcy Code.  In the event that (i) a Challenge has been timely filed and remains pending as of the date of the Auction, or (ii) a Challenge has been filed and resolved against Scintilla, unless otherwise ordered by the Court, Scintilla's or its permitted assignee(s)' right to credit bid shall be limited to the undisputed portion of Scintilla's claims. Nothing herein shall limit the Court's authority to permit, condition, limit, or deny credit bidding pursuant to section 363(k) of the Bankruptcy Code. |
| **Auction** | (a) If no Qualified Bid (other than the Stalking Horse Bid) is received by the Bid Deadline, the Stalking Horse Purchaser shall be deemed the Successful Bidder without the need or requirement to hold or open the Auction.<br><br>If the Debtors receive more than one Qualified Bid for the MII Assets (or any MII Individual Assets) or any Qualified Bid for the MII Aviation Assets (in each case other than the Stalking Horse Bid), the Debtors will conduct the Auction to determine both the Successful Bidder and the Backup Bidder with respect to such Assets.  The Auction shall take place on August 11, 2026, beginning at 10:00 a.m. (ET) at the offices of Chipman, Brown, Cicero & Cole, LLP, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, or such later date and time as selected by the Debtors (following consultation with the Consultation Parties); *provided that* such modification shall be subject to the milestones.<br><br>No later than the day before the Auction, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, or, if multiple bids are received in respect of non-overlapping Assets, the highest or best Qualified Bid(s) received in relation to each group of Assets, in each case as determined in the Debtors' business judgment (each such bid, a "Baseline Bid"), and provide copies of the documents supporting the Baseline Bid(s) to all Qualified Bidders and the Consultation Parties.  The determination of which Qualified Bid(s) constitutes the Baseline Bid(s) and which Qualified Bid(s) constitutes the Successful Bid(s) shall take into account any factors the Debtors, in consultation of the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, which may include, among other things: (a) the type and amount of Assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid; (e) the tax consequences of such Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; and (h) the impact on employees, including the number of employees proposed to be transferred and |

| Requirement | Description |
|---|---|
|  | employee-related obligations to be assumed (collectively, the "Bid Assessment Criteria"). |
|  | (b) The Auction shall be conducted pursuant to the following procedures: |
|  | (i) The Debtors shall conduct the Auction. |
|  | (ii) The Debtors and the Debtors' advisors shall direct and preside over the Auction. |
|  | (iii) The Auction shall be conducted in an open cry format (and not by way of sealed bids). At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid(s). All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders and the Consultation Parties. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid(s), all Overbids, the Successful Bid(s), and any Backup Bid(s). |
|  | (iv) Only (i) Qualified Bidders (including, for the avoidance of doubt, the Stalking Horse Purchaser) and (ii) the Consultation Parties, and each of their respective legal and financial advisors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person (live or on videoconference) and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders (including, for the avoidance of doubt, the Stalking Horse Purchaser) shall be entitled to make any subsequent bids at the Auction; provided, however, that any creditor who wishes to physically attend the Auction (other than (i) the parties set forth in the Bidding Procedures (including the Qualified Bidders), and (ii) such other parties the Debtors deem appropriate), shall provide at least two (2) days' notice of such attendance prior to the Auction by sending an email to counsel to the Debtors. |
|  | (c) Terms of Overbids |
|  | (i) "Overbid" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions: |
|  | Minimum Overbid Increment. Any Overbid to the initial Baseline Bid at the start of the Auction shall be in increments of no less than a value equal to $100,000 for MII Aviation Assets, $100,000 for all (but not less than all) MII Assets, or $50,000 with respect to any (but less than all) of the MII Assets, unless otherwise determined by the Debtors in an exercise of their business judgment; provided, however, that to the extent that the Baseline Bid constitutes the Stalking Horse Bid, the bidding for the MII Assets at the first round of bidding will start at US$5,375,000 (which amount reflects the sum of the Stalking Horse Bid for the MII Assets, the Break-Up Fee, the Expense Reimbursement, and a $100,000 Overbid increment) and the bidding for the MII Aviation Assets at the first round of bidding will start at US$5,375,000 (which amount reflects the sum of the Stalking Horse Bid for the MII Assets, the Break-Up Fee, the Expense |

19

| Requirement | Description |
|---|---|
| | Reimbursement, and a $100,000 Overbid increment).  To the extent that the Baseline Bid is other than the Stalking Horse Bid, bidding will start at an amount equal to the sum of:  (a) the value of the Baseline Bid attributable to the Assets subject to such Baseline Bid, (b) the SBG Improvement Fee attributable to such Baseline Bid, and (c) $100,000 or $50,000, as applicable. |
| | Conclusion of Each Round.  Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors. |
| | Overbid Alterations.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures. |
| | No Round-Skipping.  Round-skipping, as described herein, is explicitly prohibited.  To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Assets including, without limitation, submitting further Bids. |
| | Announcing Highest Bid.  With respect to the Auction, the Debtors shall, subsequent to each Overbid Round Deadline, announce whether the Debtors in consultation with the Consultation Parties have identified (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Baseline Bid in respect of the applicable Assets that are the subject of the Auction or (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "Prevailing Highest Bid").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria. |
| | Consideration of Overbids:<br><br>For the purpose of evaluating the value of the consideration provided by any Bid subsequent to the Baseline Bid, the Debtors will at each round of bidding, give effect to the Breakup Fee and Expense Reimbursement payable to the Stalking Horse Purchaser under the Stalking Horse APA. |

| Requirement | Description |
|---|---|
|  | The Debtors reserve the right, in their business judgment, to adjourn the Auction one or more times, to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment, may require that the Qualified Bidder has sufficient internal approvals and resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Transaction at the prevailing Overbid amount; provided that such adjournment shall be subject to the milestones. |
|  | Closing the Auction: |
|  | The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in their discretion following consultation with the Consultation Parties, to be the highest or otherwise best Qualified Bid for the applicable Assets.  Such Qualified Bid shall be declared the "Successful Bid," and such Qualified Bidder, the "Successful Bidder," at which point the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of such Successful Bid is conditioned upon approval by the Court of such Successful Bid.  As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Successful Bid, and, as applicable, cause such definitive documentation to be filed with the Court. |
|  | No Collusion; Good Faith Bona Fide Offer: |
|  | Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion, within the meaning of section 363(n) of the Bankruptcy Code with respect to any bids submitted or not submitted in connection with the Sale, and (ii) its Qualified Bid is a good faith bona fide offer and it intends to consummate the proposed Transaction if selected as the Successful Bidder. |
| **Sale Hearing** | The Sale Hearing, pursuant to which the Debtors and the Successful Bidder will consummate the Transaction (the "Approved Transaction"), will be held no later than August 19, 2026. |
|  | **The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing; provided that such later date is consistent with the milestones.  No further notice of any such continuance will be required to be provided to any party.** |
| **Backup Bidder** | Notwithstanding anything in these Bidding Procedures to the contrary, if the Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the conclusion of the Auction for the applicable Assets or any sub-group thereof, as determined by the Debtors in the exercise of their business judgment, shall be required to serve as a backup bidder (the "Backup Bidder") in accordance with the terms and conditions set forth herein.  Each Qualified Bidder shall agree and be deemed to agree to be a Backup Bidder if so designated by the Debtors, subject to the terms of such Backup Bidder's Competing APA. |

| Requirement | Description |
|---|---|
| | The identity of a Backup Bidder and the amount and material terms of the Qualified Bid of such Backup Bidder shall be announced by the Debtors, at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder related thereto.  Such Backup Bidder shall be required to keep its Qualified Bid (the "Backup Bid") (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the earlier of (i) the closing of the Approved Transaction and (ii) 37 days from entry of the Sale Order; provided, that if the Stalking Horse Purchaser is selected as the Backup Bidder, such date shall not be later than the date set forth in the Stalking Horse APA.  Each Backup Bidder's Deposit shall be held in escrow until the earlier of (i) three (3) Business Days after the closing of the Approved Transaction and (ii) 37 days from entry of the Sale Order, subject to the terms of such Backup Bidder's Competing APA. |
| | If a Successful Bidder fails to consummate the Approved Transaction contemplated by its Successful Bid, the Debtors may select the Backup Bidder (which may be the Stalking Horse Purchaser) with respect to the Assets or sub-group of the Debtors' Assets or business as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. |
| | Notwithstanding any of the foregoing, in the event that the Successful Bidder (other than the Stalking Horse Purchaser) fails to consummate the Transaction on or before August 27, 2026 (subject to an outside date of September 24, 2026) (or such date as may be extended by the Debtors in consultation with the Consultation Parties), the Backup Bid will be deemed to be the Successful Bid, the Backup Bidder will be deemed to be the Successful Bidder, and the Debtors shall be authorized to consummate the Transaction with the Backup Bidder subject to the terms of the Backup Bid without the need for further order of the Court and without the need for further notice to any interested parties. |
| **Return of Deposits** | The Deposit of the Successful Bidder shall be applied to the purchase price of the Approved Transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to each Successful Bidder and each Backup Bidder) on the date that is three (3) business days after the Auction, or as soon as is reasonably practicable thereafter. Upon the return of the Deposits, the applicable Qualified Bidders shall receive any and all interest that will have accrued thereon. |
| | If the Successful Bidder (or, if the Sale is to be closed with the Backup Bidder, then the Backup Bidder) other than the Stalking Horse Purchaser fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Competing APA, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Backup Bidder, then the Backup Bidder). |
| | To the extent the Debtors do not consummate the proposed transaction with the Backup Bidder due to the closing of the transaction with the Successful Bidder, the Backup Bidder's deposit shall be refunded within three (3) business days of the closing of the |

22

| Requirement | Description |
|---|---|
| | Approved Transaction. |
| **Notice and Consultation Parties** | Information that is provided to the "Notice Parties" under these Bidding Procedures must be provided to the following parties: (a) counsel to the Debtors, Chipman Brown Cicero & Cole LLP, 1313 N. Market Street, Suite 5400, Wilmington, DE 19801 (Attn: Mark L. Desgrosseilliers; email: desgross@chipmanbrown.com); (b) counsel to Scintilla Fund LP ("Scintilla"), Gordon Rees Scully Mansukhani LLP, 221 W. 10th Street, 4th Floor #447, Wilmington, DE 19801 (Attn: Joseph E. Brenner; email: jbrenner@grsm.com); and Chapman and Cutler LLP, 1270 Avenue of the Americas, 30th Floor, New York, NY 10020 (Attn: Michael Friedman; email: friedman@chapman.com; Eric Silvestri; email: silvest@chapman.com; and Yuliya Zahoroda; email: yzahoroda@chapman.com); (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lock Box 35, Wilmington, DE 19801 (Attn: Joseph J. McMahon, Jr.; email: joseph.mcmahon@usdoj.gov; and Hannah McCollum; email: hannah.mccollum@usdoj.gov); and (d) counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee"), McGuireWoods LLP, Gateway Plaza, 800 East Canal Street, Richmond, VA 23219-3916 (Attn: Dion W. Hayes; email: dhayes@mcguirewoods.com; and Aaron McCollough; email: amccollough@mcguirewoods.com); and Faegre Drinker Biddle & Reath LLP, 222 Delaware Avenue, Suite 1410, Wilmington, DE 19801 (Attn: Brett D. Fallon; email: brett.fallon@faegredrinker.com; and Ryan M. Messina; email: ryan.messina@faegredrinker.com). <br><br> The term "Consultation Parties" as used in these Bidding Procedures shall mean (a) the Creditors' Committee and (b) in the event that the Stalking Horse Purchaser terminates its credit bid, Scintilla. |
| **Reservation of Rights** | The Debtors reserve their rights, subject to prior consultation with the Consultation Parties, to modify these Bidding Procedures in their business judgment in any manner that will best promote the goals of these Bidding Procedures or impose at or prior to the Auction, additional customary terms and conditions on a Transaction, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids (other than the Stalking Horse Bid). Notwithstanding the foregoing, the Debtors shall not be permitted to modify these Bidding Procedures in any way that permits the submission of Bids after the close of bidding or the close of the Auction. |

23.    Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

23

**IV.    The Stalking Horse APA.**

24.    The Debtors are in process of finalizing the Stalking Horse APA with the Stalking Horse and will file a supplement outlining certain material terms of the Stalking Horse APA, and certain provisions that are required to be highlighted pursuant to Local Rule 6004-1(b)(iv), along with a copy of the Stalking Horse APA in advance of the hearing on the Motion.

**V.    Bid Protections.**

25.    By this Motion, the Debtors request authority to, among other things, provide the Stalking Horse Purchaser, subject to the terms and conditions of the Stalking Horse APA, the Bid Protections described above.  The proposed break-up fee is $150,000 or 3% of the Purchase Price for the MII Assets and $150,000 or 3% of the Purchase Price for the MII Aviation Assets for a total of $300,000 or 3% of the MII Assets and MII Aviation Assets (each, a "Break-Up Fee").  In the event the Stalking Horse Purchaser is not the Successful Bidder with respect to any MII Individual Asset, the Breakup Fee shall equal 3% of the Allocated Asset Value of such asset attributed to the Stalking Horse Purchaser at the start of the Auction in accordance with the Bidding Procedures.  The expense reimbursement is capped at US$125,000 for each of the MII Assets and the MII Aviation Assets – *i.e.,* US$250,000 in the aggregate (each, an "Expense Reimbursement").

26.    The Bid Protections are well within the range of bid protections often allowed in this District for sale processes under section 363 of the Bankruptcy Code.  Further, the Bid Protections are reasonable in light of, among other things, the Stalking Horse Purchaser's considerable efforts in setting a floor for the auction of the Debtors' Assets.

27.    In addition, the Debtors' estates will not be impacted by the Bid Protections because the Bidding Procedures provide that any overbid must include an amount of cash consideration equal to or exceeding the sum of the Purchase Price (as defined in the Stalking Horse APA), plus the amount of the Bid Protections, plus a $100,000 overbid increment for the MII Aviation Assets,

plus a $100,000 overbid increment for all (but not less than all) MII Assets (or $50,000 for any (but less than all) of the MII Assets), and plus any sale transaction fee payable to SBG.

**VI.    Notice Procedures for the Sale, Bidding Procedures, Auction, and Sale Hearing.**

28.    The Debtors also request approval of the Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2.

29.    Within three (3) business days of the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors will cause the Sale Notice, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known: (a) the U.S. Trustee; (b) the Creditors' Committee; (c) counterparties to the executory contracts and unexpired leases of nonresidential property (the "Contract Counterparties"), if known; (d) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (e) the Internal Revenue Service; (f) all applicable state and local taxing authorities (the "Authorities"; (g) all the Debtors' other creditors; (h) each governmental agency that is an interested party with respect to the proposed Sale Transaction; and (i) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  With respect to creditors with a primary address in Israel, the Debtors will serve such creditors, or their known counsel, by overnight courier or by email at such creditor's last known e-mail address if to the extent that delivery by U.S. mail cannot be made because such service is unavailable, due, among other things, to the war in Israel. The Debtors shall serve the Sale Notice, in English and Hebrew, on any of such parties listed above with an address in Israel by overnight courier and email, where the email address of any creditor located in Israel is known to the Debtors.

30.    Within seven (7) business days of the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors will publish the Sale Notice, with any

modifications necessary for ease of publication (the "Publication Notice") once in the national edition of *USA Today* or another nationally circulated newspaper and one Israeli-based national newspaper (translated to Hebrew), with any modifications necessary for ease of publication.

31.     The Debtors respectfully submit that the Sale Notice and Publication Notice are reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale Transaction, including: (a) the date, time, and place of the Auction; (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale Transaction and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a description of the Sale Transaction as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale Transaction proceeds; and (e) notice of the proposed assumption and assignment of the Contracts to the Successful Bidder arising from the Auction, if any.

32.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice and the Assumption Notice substantially in the form attached as Exhibit 4 to the Bidding Procedures Order (where applicable), as provided for herein, constitutes good and adequate notice of the Sale Transaction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors propose that no other or further notice of the Sale Transaction shall be required.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

**VII.     Assumption and Assignment Notice.**

33.     As soon as practicable, the Debtors intend to file a motion to fix monetary amounts that the Debtors would be obligated to pay in connection with the assumption or the assumption and assignment of executory contracts and unexpired leases and to elicit any objection to the

assumption and assignment of such executory contracts and unexpired leases other than objections based on adequate assurance of future performance by a purchaser (such motion, the "Cure Amounts Motion").

34.     The Debtors are in the process of reviewing their prepetition executory contracts and unexpired leases and designating which of those executory contracts and leases a purchaser of all of the Assets may wish to have assumed and assigned to it.  At the Sale Hearing, to facilitate and effect the sale of Assets, the Debtors will also seek authorization to assume certain of the executory contracts and leases (collectively, the "Purchased Contracts" or the "Assumed Contracts") and to assign the Purchased Contracts to the Successful Bidder.

35.     By this Motion, the Debtors request approval of the assumption and assignment notice (the "Assumption Notice"), substantially in the form attached to the Bidding Procedures Order as Exhibit 4, to be sent to counterparties to Purchased Contracts to provide notice of the potential assumption and assignment of their Purchased Contracts by the Successful Bidder. Supplements to the Assumption Notice shall be served on parties no later than two days following the Stalking Horse Purchaser's or other potential bidder's designation of any additional executory contracts or unexpired leases as Purchased Contracts.  Any objections by the counterparties to adequate assurance of future performance by the Stalking Horse Purchaser with respect to Purchased Contracts are due **on or before 4:00 p.m. (Eastern) on August 13, 2026** (the "Sale Transaction Objection Deadline"), and any objections with respect to subsequently added Purchased Contracts are due seven (7) days from service of the applicable supplement to the Assumption Notice.

36.     As soon as reasonably practicable after the completion of the Auction, the Debtors shall file with the Court a notice identifying the Successful Bidder (a "Notice of Successful

27

Bidder"), which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (if any) and the amount of each of the Winning Bid and the Back-Up Bid (if any), (ii) the Purchased Contracts the Successful Bidder intends to assume, and (iii) the proposed assignee(s) of such Purchased Contracts.

37.     The inclusion of a contract, lease, or other agreement on either the Assumption Amounts Motion, the list of Purchased Contracts attached to the Stalking Horse APA and any Assumption Notice shall not (a) constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such contract, lease, or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights with respect thereto shall be reserved; or (b) obligate the Debtors to assume any Purchased Contract listed thereon or the Successful Bidder(s) to take assignment of such Purchased Contract.  Only those Purchased Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder, subject to the terms of the applicable sale order and asset purchase agreement.

38.     If, following the Closing Date, and only to the extent permitted under the asset purchase agreement that is the Winning Bid, the Stalking Horse Purchaser or other Successful Bidder designates a contract or lease not initially included as a Purchased Contract as a Purchased Contract, and not previously rejected by the Debtors, the Debtors will promptly file and serve, at the Stalking Horse Purchaser or other Successful Bidder's expense (except with respect to any Omitted Contracts under the Stalking Horse APA, which shall be at the Debtors' expense), a supplemental notice of potential assumption and assignment by electronic transmission, hand

delivery, or overnight mail on the counterparty to the Purchased Contract (each, a "Supplemental Purchased Contract Counterparty") to each impacted Purchased Contract, and its attorney, if known, at the last known address available to the Debtors (a "Supplemental Assumption Notice").

39.    Any Supplemental Purchased Contract Counterparty may file an objection (a "Supplemental Purchased Contract Objection") to, as applicable, the proposed assumption and assignment of such Purchased Contract, the proposed Cure Amounts (if any) (as defined below), or adequate assurance of future performance by the Stalking Horse Purchaser or other Successful Bidder.  All Supplemental Purchased Contract Objections must: (a) to the extent the monetary amount the Debtors believes they will be required to pay under section 365(b)(1)(A) and (B) of the Bankruptcy Code (the "Cure Amount") has not been resolved by the Assumption Amounts Motion, state, with specificity, the legal and factual basis for the objection and, if applicable, what Cure Amounts are required; (b) include appropriate documentation in support of the objection; and (c) be filed and served so as to be actually received by the Objection Notice Parties no later than seven (7) days from the date of service of such Supplemental Assumption Notice, which date will be set forth in the Supplemental Assumption Notice.

## BASIS FOR RELIEF

I.    **THE COURT SHOULD APPROVE THE BIDDING PROCEDURES AND ENTRY INTO THE STALKING HORSE APA**

40.    The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same).  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d

527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and … maximize the value of the debtor's assets").

41.    The Debtors and their professional advisors, including SBG, have designed the Bidding Procedures, including the Sale Timeline, to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates and creditors.  The proposed Sale Timeline contemplates an efficient sale process, and the Debtors want to ensure that all interested parties, and any potential bidders, understand the timeline to participate in the sale process and submit Acceptable Bids.

42.    The Debtors submit that the Sale Timeline is appropriate.  The Debtors and their advisors have negotiated a timeline that balances the need to provide adequate notice to parties in interest, including to sufficiently market the Assets in the context of a postpetition sale process, with the need to quickly and efficiently consummate one or more sale transactions while the Assets have realizable going-concern value.  The sale timeline is a product of good-faith, arm's-length negotiations and reflects the best option for maximizing the value of the Assets under the circumstances of these chapter 11 cases.  Moreover, Bankruptcy Rule 2002(a)(2) requires twenty-one (21) days' notice of the Sale and the Sale Timeline is more than adequate.

43.    Failure to adhere to a quick and efficient Sale Timeline, could and compromise the Debtors' chapter 11 strategy of transitioning the Debtors' Assets to new owners efficiently and expeditiously.  Given the anticipated cost of administering these chapter 11 cases, the Debtors cannot afford any delay in monetizing their Assets.  The proposed Sale Timeline allows the Debtors to maximize value while minimizing administrative expenses.

44.    The Bidding Procedures will allow the Debtors to conduct the Auction in an orderly, fair, and open fashion, which will encourage participation by financially capable bidders,

30

thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets.  The Debtors' entry into the Stalking Horse APA further increases the likelihood of the Debtors receiving the highest or best consideration for the Assets by setting the floor for the Sale.  Furthermore, the Bidding Procedures and the Stalking Horse APA provide an appropriate framework for the Debtors and their fiduciaries and professional advisors to review, analyze and compare any bids received to determine which bids are in the best interests of the Debtors' estates and their creditors.  SBG, the Debtors' investment banker in connection with the sale process, believes that the Bidding Procedures and Stalking Horse APA are appropriately crafted to, and will maximize, the value of the Assets.  Approval of the Bidding Procedures and the Debtors' entry into the Stalking Horse APA sets a floor for the Debtors at the Auction and increases the likelihood that the Debtors receive the highest or best consideration for the Assets.

45.     The Debtors submit that the Bidding Procedures and entry into the Stalking Horse APA are necessary and provide for a fair and transparent sale process that will result in the Debtors' obtaining the highest or otherwise best value for the Assets.  Therefore, the Debtors request the Court to approve the Bidding Procedures and entry into the Stalking Horse APA through the Bidding Procedures Order.

## II.    THE BID PROTECTIONS HAVE A SOUND BUSINESS PURPOSE AND SHOULD BE APPROVED

46.     The use of a stalking horse in a public auction process for sales is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Interforum Holding LLC*, No. 11-CV-219, 2011 WL 2671254 at *1 n.1 (E.D. Wis. July 7, 2011).  As a result, Stalking Horse Purchasers virtually always require break-up fees and, in many cases, other forms of bidding protections as

an inducement for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id*. (citation omitted).  Thus, the use of bidding protections has become an established practice in chapter 11 cases.

47.    Indeed, forms of bid protections are a normal and, in many cases, necessary component of significant sales conducted in chapter 11.  Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

48.    As a result, courts routinely approve such bid protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees … depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (citing *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999)) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (same).  The allowance of the Expense Reimbursement is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse APA will establish a floor for further bidding that may increase the consideration given in exchange for the Assets that are the subject of such Stalking Horse APA, which will inure to the benefit of the Debtors' estates.

49. In the Third Circuit, bid protections, such as the Break-Up Fee and Expense Reimbursement proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 ("[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503."); *Women First Healthcare, Inc.*, 332 B.R. 115, at 121–23 (Bankr. D. Del. 2005) (holding that the general standard used for all administrative expenses applies to bid protections). Thus, the "allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (quoting *O'Brien*, 181 F.3d at 535).

50. Here, the Break-Up Fee and Expense Reimbursement are critical components of the Debtors' ability to obtain the commitment of the Stalking Horse Purchaser. The Break-Up Fee and Expense Reimbursement offered to the Stalking Horse Purchaser were negotiated in good faith and at arm's length and with significant give-and-take. As a result, by including the Break-Up Fee and Expense Reimbursement, the Debtors ensure that their estates can realize the benefit of a transaction with the Stalking Horse Purchaser without sacrificing the potential for interested parties to submit overbids at the Auction.

51. The Break-Up Fee and Expense Reimbursement provided to the Stalking Horse Purchaser (a) are an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Purchaser, and (c) are fair, reasonable, and appropriate, including in light of the size and nature of the proposed Sale Transaction, the commitments that have been made, and the efforts

that have been and will be expended by the Stalking Horse Purchaser.  *See* Manning Declaration ¶¶ 16-20.

52.     If the Court does not approve the Break-Up Fee and Expense Reimbursement, the Debtors risk the Stalking Horse Purchaser withdrawing the Stalking Horse APA, to the detriment of the Debtors' estates.  In short, the proposed Break-Up Fee and Expense Reimbursement constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser."  *Integrated Res.*, 147 B.R. at 662.

53.     The Break-Up Fee and Expense Reimbursement are a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors, their estates, and all stakeholders.    Accordingly, the Court should approve the Break-Up Fee and Expense Reimbursement.

### III.    SCINTILLA SHOULD BE AUTHORIZED TO CREDIT BID ON THE ASSETS UNDER SECTION 363(K) OF THE BANKRUPTCY CODE

54.     Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value.  *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459–60 (3d Cir. 2006).

55.     Subject to a resolution on a potential Challenge and subject to the Challenge Deadline (as each is defined in the Supplemental Motion).  In the event that (a) the Challenge

Deadline has expired without the filing of a Challenge, or (b) a Challenge has been filed and resolved favorably for Scintilla by the Bid Deadline, Scintilla, or its permitted assignee(s), shall have the right to credit bid on a dollar-for-dollar basis up to the full allowed amount of Scintilla's claims pursuant to section 363(k) of the Bankruptcy Code.  In the event that (i) a Challenge has been timely filed and remains pending as of the date of the Auction, or (ii) a Challenge has been filed and resolved against Scintilla, unless otherwise ordered by the Court, Scintilla's or its permitted assignee(s)' right to credit bid shall be limited to the undisputed portion of Scintilla's claims.  Nothing herein shall limit the Court's authority to permit, condition, limit, or deny credit bidding pursuant to section 363(k) of the Bankruptcy Code.

56.    As a result, the Debtors propose that Scintilla be entitled to conditionally credit bid all or a portion of Scintilla's secured claims, or any part thereof, under section 363(k) of the Bankruptcy Code in any sale of the Assets, and may assign such right to credit bid in whole or in part to any of its affiliates.

## IV.    SUFFICIENT BUSINESS JUSTIFICATION EXISTS FOR CONSUMMATION OF THE SALE UNDER SECTIONS 105(A) AND 363(B) OF THE BANKRUPTCY CODE

57.    Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–

71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

58.     The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

59.     The Debtors submit that their decision to consummate the Sale represents a reasonable exercise of the Debtors' business judgment, and accordingly the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors will continue to conduct an extensive and fulsome process to market the Assets.  The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or best value available for the Assets by allowing the market to dictate the value of the Assets and will provide a greater recovery than would be provided by any other available alternative.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then the Successful Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

60.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Stalking Horse APA, the Bidding Procedures, the Auction, the Sale Hearing, and the Sale to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

61.     The Sale, conducted in accordance with the Bidding Procedures, will generate significant value for the Debtors' estates and represents the best path forward for maximizing recoveries in connection with these chapter 11 cases.  The Debtors submit that ample business justification exists for the consummation of the Sale and, therefore, request that this Court approve such Sale.

**V.      THE SALE OF THE ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN THE ASSUMED LIABILITIES IS AUTHORIZED UNDER SECTION 363(F) OF THE BANKRUPTCY CODE**

62.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

63.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the Sale of the Assets "free and clear" of liens and interests.  *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens.  *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

64.     The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell the Assets on a final "as is" basis, free and clear of any and all Liens other than Assumed Liabilities (both as defined in the Stalking Horse APA) (and except as otherwise expressly set forth in the Sale Order), in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to such Sale.  In particular, the Debtors believe that section 363(f)(2) of the Bankruptcy Code will be met because the Prepetition Agent consented to the Sale as the Stalking Horse Purchaser pursuant to the Stalking Horse APA, subject to higher or better terms as set forth in a Competing APA.

65.     Moreover, with respect to any other party asserting a lien, claim, encumbrance or the like against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  In particular, known lienholders

will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale should be deemed to have consented.  *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).  Consistent with the foregoing, the Bidding Procedures Order provides that the absence of a timely objection to the Sale of the Assets in accordance therewith shall be "consent" to such Sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

## VI.   THE SUCCESSFUL BIDDER SHOULD BE ENTITLED TO THE PROTECTIONS OF SECTION 363(M) OF THE BANKRUPTCY CODE

66.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  *See* 11 U.S.C. § 363(m).  In approving the Sale free and clear of Liens other than Assumed Liabilities, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures, including, without limitation, the Stalking Horse Purchaser, are entitled to the protections afforded by section 363(m) of the Bankruptcy Code.  Such relief is appropriate in that selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the

opportunity to review and object to a proposed transaction. *See In re Tempo Technology Corp.*, 202 B.R. 363, 370 (D. Del. 1996) (affirming the bankruptcy court's approval of a sale under section 363(b) of the Bankruptcy Code where, *inter alia*, adequate notice to creditors and other interested parties was given and the negotiations between buyer and seller took place at arm's-length with no evidence of fraud, collusion, or interested dealing).

## VII.   THE ASSUMPTION AND ASSIGNMENT OF THE PURCHASED CONTRACTS IN CONNECTION WITH THE SALE SATISFIES SECTION 365 OF THE BANKRUPTCY CODE

67.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

68.     In reviewing whether to approve the Debtors' assumption of a contract or an unexpired lease, the Court applies the "business judgment" standard. *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice). As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at 872). Indeed, "the sole issue is whether the rejection benefits the estate." *In re HQ Global*, 290 B.R. at 511.

69.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See, e.g., id.*; *In re Exide Techs.*, 340 B.R. 222, 239

40

(Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."). Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the [Bankruptcy] Code.") (internal quotations omitted); *see also In re Trans World Airlines, Inc.*, 261 B.R. 103, 123 (Bankr. D. Del. 2001) ("Section 365(a) grants a debtor in possession the fundamental authority to assume or reject an executory contract as a vital part of the bankruptcy process … [The debtor in possession] has decided, based on its business judgment and as joined by the Committee, that rejection is in the best interest of the estate and its decision is entitled to the appropriate deference by this Court.").

70.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Purchased Contracts, if any, is in the best interests of the Debtors and their estates, and accordingly the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. *See, e.g., In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182–83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary

circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

71.     As set forth above, the Sale will provide significant benefits to the Debtors' estates. To that end, the assumption, assignment and sale of the Purchased Contracts is necessary for the Debtors to obtain the benefits of the Stalking Horse APA or a Competing APA, as applicable.  In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  Thus, following an assignment to the Successful Bidder of any Purchased Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

72.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Purchased Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  As detailed in the Stalking Horse APA and the Bidding Procedures Order, the Debtors propose fixing the Cure Amounts (as defined in the Stalking Horse APA) through the Stalking Horse APA and allowing the counterparties the opportunity to object to the proposed Cure Amount, as well as the Debtors' assumption and assignment of the Purchased Contracts.

73.     Section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.  *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v.*

*Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

74.    Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

75.    Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Purchased Contract.  For its bid to be deemed an Acceptable Bid, each Acceptable Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including: (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; and (b) a contact person for the proposed assignee that the counterparty may directly contact in connection with the adequate assurance of future performance.  To the extent that the Acceptable Bidder (other than the Stalking Horse Purchaser) is a newly formed acquisition entity or the like, the financial and other information supporting the Acceptable Bidder's financial wherewithal shall include financial and other

information supporting the financial wherewithal of the Acceptable Bidder's parent company or sponsor. Furthermore, given that the Debtors will submit evidence that all requirements for the assumption and assignment of such contracts at the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.

76.     Therefore, the Debtors request the Court to approve the proposed assumption and assignment of the Purchased Contracts.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(H) AND 6006(D)**

77.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under section 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). As set forth throughout this Motion, any delay in the Debtors' ability to consummate the Sale on the timeline contemplated by the Bidding Procedures would be detrimental to the Debtors, their creditors and estates.

78.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent applicable.

**NOTICE**

79.     The Debtors will provide notice of this Motion to: (a) United States Trustee for the District of Delaware; (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the Creditors'

Committee; (g) counsel to Scintilla; (h) banks and financial institutions where the Debtors maintain accounts; (i) the Authorities; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors request entry of the Bidding Procedures Order and the Sale Order to be filed in advance of the Sale Hearing, granting the relief requested herein and such other and further relief as is just and proper.

Dated: May 29, 2026  **CHIPMAN BROWN CICERO & COLE, LLP**
      Wilmington, Delaware

*/s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware  19801
Telephone: (302) 295-0192
E-mail: desgross@chipmanbrown.com

*Counsel to the Debtors and Debtors in Possession*