**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MII Aviation Services LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-10123 (LSS)<br><br>(*Jointly Administered*)<br><br>**Related Docket No. 400** |

**JOINT OBJECTION OF THE DEBTORS, OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND SCINTILLA FUND, L.P. TO THE MOTION OF CHRISTOPHER R. DONOVAN, SR., CREDITOR AND PARTY IN INTEREST, FOR TEMPORARY ALLOWANCE OF PROOF OF CLAIM NO. 1 FOR VOTING PURPOSES PURSUANT TO FED. R. BANKR. P. 3018(a)**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), the Official Committee of Unsecured Creditors appointed in these cases (the "**Committee**"), and Scintilla Fund, L.P. ("**Scintilla**," together with the Debtors and the Committee, the "**Objectors**") by and through undersigned counsel, hereby jointly object to the *Motion of Christopher R. Donovan, Sr., Creditor and Party in Interest, for the Temporary Allowance of Proof of Claim No. 1 for Voting Purposes Pursuant to Fed. R. Bankr. P. 3018(a)* [Docket No. 400] (the "**Motion**"). In Support of this objection (the "**Objection**"), the Objectors state as follows:

**BACKGROUND**

1. On February 1, 2026, the Debtors commenced with the Court voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the 11 U.S.C. §§ 101-1532 (as amended and applicable hereto the "**Bankruptcy Code**"). The Chapter 11 Cases are jointly administered for procedural

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: MII Aviation Services LLC (8667); and Michal International Investment LLC (2440). The Debtors' service address is c/o Arbel Capital Advisors, Attn: Daniel Sasson, 4 Waverly Place, Lawrence, NY 11559.

purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**").

2. The Debtors are authorized to continue operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. Additional factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in the *Declaration of Boaz Toshav in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), which is fully incorporated herein by reference.

4. On February 16, 2026, the Office of the United States Trustee appointed the Committee in the Chapter 11 Cases. *See* [Docket No. 22].

5. On March 23, 2026, the Court entered the *Order Pursuant to Rule 3003(c)(3) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof* (the "**Bar Date Order**") [Docket No. 95]. Pursuant to the Bar Date Order, the General Bar Date (as defined in the Bar Date Order) was May 15, 2026.

6. On May 5, 2026, Christopher R. Donovan, Sr. ("**Mr. Donovan**") filed his *Omnibus Filing Package of Christopher R. Donovan, Sr. pro se* [Docket No. 199], which included a motion for an allowance of an administrative expense on the same basis as the proof of claim he filed.

7. On May 8, 2026, Mr. Donovan filed his proof of claim (the "**Donovan POC**") against the estate of MII Aviation Services LLC ("**MII Aviation**").

8. On June 30, 2026, the Debtors filed the *Debtors' Objection to Claim Filed by Christopher R. Donovan, Sr., and Motion of Christopher R. Donovan Sr. for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(2)* (the "**Claim Objection**") [Docket No. 308].

9. On July 8, 2026, the Court held a hearing regarding Mr. Donovan's administrative expense claim. On July 29, 2026, this Court issued the *Memorandum Order* [Docket No. 351] denying Mr. Donovan's administrative expense claim.

10. On August 19, 2026, the Debtors and the Committee filed the *Joint Motion of Debtors and Official Committee of Unsecured Creditors for Order (I) Approving Combined Disclosure Statement and Plan on Interim Basis for Solicitation Purposes, (II) Scheduling Combined Hearing and Objection Deadline, (III) Establishing Procedures for Solicitation and Tabulation of Votes, (IV) Approving Form of Ballot and Solicitation Package, and (V) Approving Notice* [Docket No. 377] (the "**Disclosure Statement and Solicitation Procedures Motion**").

11. On September 8, 2026, Mr. Donovan filed the Motion, seeking numerous forms of relief, including a request for affirmative relief under Bankruptcy Rule 3018(a).

12. On September 15, 2026, the Debtors and the Committee jointly filed the *First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation Proposed by the Debtors and the Official Committee of Unsecured Creditors* (the "**Disclosure Statement and Plan**") [Docket No. 421].

13. On September 22, 2026, the Court entered the *Order (I) Approving Revised First Amended Combined Disclosure Statement and Plan on Interim Basis for Solicitation Purposes, (II) Scheduling Combined Hearing and Objection Deadline, (III) Establishing Procedures for Solicitation and Tabulation of Votes, (IV) Approving Form of Ballot and Solicitation Package, and*

*(V) Approving Notice* (the "**Approval Order**") [Docket No. 447]. Pursuant to the Approval Order, the deadline for objectors to respond to motions under Bankruptcy Rule 3018 is October 21, 2026, at 4:00 p.m. (prevailing Eastern Time).

## SUMMARY OF OBJECTION

14. Mr. Donovan does not, and cannot, meet his burden to temporarily allow his claim against MII Aviation for voting purposes. As stated in the Claim Objection, the Employment Agreement (as defined below) for which Mr. Donovan bases his claim is barred by the Massachusetts statute of frauds and is subject to heightened scrutiny pursuant to *Pepper v. Litton*, 308 U.S. 295, 306, 60 S. Ct. 238, 245, 84 L. Ed. 281 (1939), that the Employment Agreement cannot withstand. Pursuant to the heightened scrutiny discussed in *Pepper* (and further discussed below), the burden is on the insider to prove the good faith of the transaction and its inherent fairness from the viewpoint of the company and those interested therein. Given that Mr. Donovan is on both sides of the transaction for the Employment Agreement and the Bonus Agreement (as defined below), Mr. Donovan also must show the transactions satisfy the entire fairness standard under Delaware law. Mr. Donovan has not set forth any facts that would satisfy either heightened scrutiny standard. The Objectors expressly adopt and incorporate the Claim Objection, and the legal arguments and factual assertions set forth therein, for purposes of this Objection.

## OBJECTION

15. Pursuant to the Disclosure Statement and Plan, Mr. Donovan's claim would be classified in Class 3B – General Unsecured Claims of MII Aviation. *See* Disclosure Statement and Plan, Exhibit A. This class has three potential claims: the claim of Mr. Donovan, a claim filed by Amos Madanes, and a claim filed by EAC Realty Trust.

16. In his Motion, Mr. Donovan requests the Donovan POC be allowed for voting purposes only. Mr. Donovan notes his claim is approximately seventy-nine percent of Class 3B by amount, not allowing his claim for voting purposes "determines the class outcome," and allowing his claim for voting purposes does not prejudice the estates or any party. Mr. Donovan also states that the claim is documented and its amount is not in serious dispute for voting purposes. The Objectors disagree, and accordingly, file this Objection.

**A. <u>As a Matter of Law, the Bonus Agreement Does Not Obligate MII Aviation, and the Donovan POC Should Be Valued at $0 for Voting Purposes</u>.**

17. Regarding allowing a claim for voting purposes, whether a court grants a claim for voting purposes is ultimately left to the court's discretion. *See In re Mangia Pizza Invs., LP*, 480 B.R. 669, 680 (Bankr. W.D. Tex. 2012) ("While several courts have developed various multi-factor tests to apply when determining *whether to temporarily allow a claim for purposes of voting, the choice is ultimately one of the court's discretion.*") (emphasis added).

18. In determining whether to temporarily allow a claim for voting purposes, "[c]ourts tend to look at the debtor's schedules, the proof of claim, and the objection filed to the proof of claim." *In re Pac. Sunwear of Cal., Inc.*, No. 16-10882 (LSS), 2016 WL 4250681, at *3 (Bankr. D. Del. Aug. 8, 2016) ("***Pac Sun***"); *see also In re Stone Hedge Props.*, 191 B.R. 59, 65 (Bankr. M.D. Pa. 1995) (identifying "(1) the manner in which the claim was initially scheduled by the Debtor; (2) the proof of claim filed by the creditor; and (3) the objection (adversary counterclaim) of the Debtor").

19. Each of these factors supports denying the Motion. First, MII Aviation scheduled a claim for Mr. Donovan, in the amount of $2,065,829.05 as "disputed." From the outset of these bankruptcy cases through the present day, MII Aviation has disputed the validity of Mr. Donovan's claim. Second, the Bonus Agreement attached to the proof of claim itself shows that any money

to be paid to Mr. Donovan would be paid by BEH. Section 5 of the bonus agreement explicitly states "**The Parties acknowledge and agree that [sic] Boston Executive Helicopters LLC, shall pay Donovan**…" *Id.* (emphasis added). Third, and finally, this Objection shows that MII Aviation does not, and cannot, owe Mr. Donovan any money based on the Bonus Agreement, and that the Employment Agreement that the Bonus Agreement purports to modify is not enforceable since it does not satisfy the Massachusetts statute of frauds.

20. Bankruptcy Rule 3018(a)(4) states "[e]ven if an objection to a claim or interest has been filed, the court may, after notice and a hearing, temporarily allow a claim or interest in an amount that the court considers proper for voting to accept or reject a plan." FED. R. BANKR. P. 3018(a)(4).

21. Although courts are mindful that Rule 3018 should not enable abuse by plan proponents, it is not so permissive as to permit voting for any creditor regardless of the facts and circumstances surrounding their claim. *Pac Sun,* 2016 WL 4250681, at *3 (quoting *In re Armstrong*, 294 B.R. 344, 354 (B.A.P. 10th Cir. 2003)). This is especially true, where, as here, concerns about the Objectors misusing Rule 3018 are absent, and instead the Court faces a claim that is almost certainly legally barred under multiple theories, at least as against either Debtor.

22. Mr. Donovan filed his proof of claim on May 8, 2026, against the estate of MII Aviation. Attached to the Donovan POC is an agreement (the "**Bonus Agreement**") that purports to modify an unexecuted employment agreement (the "**Employment Agreement**") between Moshe Yanai ("**Mr. Yanai**"), as manager of MII Aviation, and Mr. Donovan. MII Aviation scheduled the claim as disputed, and the Debtors objected to the Donovan POC on June 30, 2026, weeks before the Debtors and the Committee sought approval of solicitation procedures. The Debtors and the Committee do not seek to silence a dissenting creditor; they ask only that Mr.

Donovan's voting power reflect the economic interest he actually holds in MII Aviation's estate. *See id.* at *3 (Rule 3018 determination "should ensure that the voting power is commensurate with the creditor's economic interests in the case"). On that question, the Court already made findings after an evidentiary hearing at which Mr. Donovan testified: Mr. Donovan "is a co-founder of BEH, still operates BEH and is the chief pilot"; he "is not employed by either Debtor"; the Bonus Agreement concerns "annual bonus payments owed to Mr. Donovan for his services to BEH"; and he "currently receives a $240,000 annual salary, paid on a weekly basis by BEH." *See* [Docket No. 351] at 2, 3. The purported Bonus Agreement itself specifies that Boston Executive Helicopters LLC would pay the asserted bonus amount. *See* Bonus Agreement § 5.

23. Neither the Bankruptcy Code nor the Bankruptcy Rules prescribe a methodology for temporary allowance; the determination is committed to the Court's discretion. *Pac Sun*, 2016 WL 4250681, at *3; *In re Innovasystems, Inc.*, No. 11-36228 (ABA), 2014 WL 7235527, at *7 (Bankr. D.N.J. Dec. 18, 2014) ("temporary allowance is left to the discretion of the court"). In exercising that discretion, courts in this Circuit look to the Third Circuit's guidance in *Bittner v. Borne Chemical Co.*, 691 F.2d 134 (3d Cir. 1982). *See Innovasystems,* 2014 WL 7235527, at *7. Under *Bittner*, the Bankruptcy Court may use "whatever method is best suited to the particular contingencies at issue," but it "is bound by the legal rules which may govern the ultimate value of the claim" where, as here, "the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law." *Bittner*, 691 F.2d at 135.

24. Applying these principles, courts temporarily allow a claim at $0 where the claimant is unlikely to succeed on the merits. *Pac Sun*, 2016 WL 4250681, at *3; *Innovasystems,* 2014 WL 7235527, at *8 (estimating claim at $0 under Rule 3018 where "no claim or, at this time, even a basis for a claim exists"); *see also Bittner*, 691 F.2d at 139 (affirming zero valuation where

claims "lacked legal merit" and the court was "[f]aced with only the remote possibility" that the claimants would prevail).

25. A $0 valuation is especially appropriate where, as here, the disputed claim asserted by an insider of the Debtors would otherwise control the outcome of the class vote. Mr. Donovan asserts that his claim represents approximately seventy-nine percent of Class 3B and that its treatment determines the class outcome. *See* [Docket No. 400 at 24]. Courts have declined to give such claims voting power precisely because doing so would hand control of the plan process to a claimant whose recovery is doubtful. *See Bittner*, 691 F.2d at 137 (valuing claims by present probability of success could have given claimants "a significant, if not controlling, voice in the reorganization proceedings" despite the possibility that they would ultimately lose); *Innovasystems*, 2014 WL 7235527, at *9 (estimating claim at asserted amount "would allow it to control confirmation, a position not in line with the policies of reorganization"); *Pac Sun*, 2016 WL 4250681, at *10 (declining to allow claim in full amount where doing so would give the claim "an outsized influence over the plan process"). Such denial is particularly appropriate here given Mr. Donovan controls BEH, an affiliate of the Debtors, and thus is himself an insider of the Debtors. *See* 11 U.S.C. §§ 101(31)(E) (defining "insider" to include any "affiliate, or insider of an affiliate as if such affiliate were the debtor"). Nor does a $0 valuation prejudice Mr. Donovan's ultimate rights: such determination is for voting purposes only, it does not disallow his claim, it preserves his alleged right of recovery against his actual employer, BEH, and he retains standing as a party in interest to object to confirmation. *See Innovasystems*, 2014 WL 7235527, at *10.

26. As a matter of law, Mr. Donovan has no claim against MII Aviation. The Donovan POC was filed against the estate of MII Aviation, but nothing in the Donovan POC or the Bonus Agreement obligates MII Aviation to pay any money to Mr. Donovan. First, any money to be paid

to Mr. Donovan is based on the gross income of Boston Executive Helicopters LLC ("**BEH**"). Section 2 of the Bonus Agreement attached to the Donovan POC explicitly states "The Company agreed to pay Donovan a yearly bonus based on the Boston Executive Helicopters LLC gross income…" The Bonus Agreement defines the "Company" as both BEH and MII Aviation, but Section 5 of the agreement states that BEH shall be the entity that pays Mr. Donovan. Section 5 of the Bonus Agreement states "The Parties acknowledge and agree that [sic] Boston Executive Helicopters LLC, shall pay Donovan…" Nothing in the Bonus Agreement imposes BEH's payment obligations upon MII Aviation.

27. The Court has already confirmed as much. After an evidentiary hearing at which Mr. Donovan testified, the Court found that Mr. Donovan "is not employed by either Debtor" and that the Bonus Agreement concerns "annual bonus payments owed to Mr. Donovan for his services to BEH." Memorandum Order [Docket No. 351] at 2. Because this conclusion turns on the plain terms of the Bonus Agreement and the Court's prior findings, the Court need not reach the allocation of the burden of proof or any of the remaining issues addressed below. On this ground alone, the Donovan POC should be valued at $0 for voting purposes.

28. Moreover, the Bonus Agreement itself—and any theoretical obligation of MII Aviation thereunder—will be avoidable as a fraudulent transfer. Under 11 U.S.C. § 548(a)(1)(B)(IV), an obligation of the debtor is avoidable if the debtor received less than reasonably equivalent value in exchange for such obligation, and the debtor "made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business." 11 U.S.C. § 548(a)(1)(B)(IV). Here, the obligations under the Bonus Agreement allegedly incurred by MII Aviation were within two years of the Petition Date, were made in exchange for zero consideration

to the Debtors, and were made to an insider of the Debtors in connection with an employment contract entered outside the ordinary course of business. Mr. Donovan—an insider of the Debtors—should not be entitled to control a class for voting purposes on account of an obligation that is facially avoidable.

### B. <u>To the Extent the Court Reaches the Remaining Issues, Mr. Donovan Bears the Burden of Proof, and He Cannot Carry It</u>

29. The remaining grounds for denying the Motion—that the Employment Agreement fails the Massachusetts statute of frauds, that the parties never manifested an intent to be bound, and that the underlying agreements cannot satisfy the entire fairness standard—require the Court to consider the record, and thus to determine which party bears the burden of proof. Neither the Bankruptcy Code nor the Bankruptcy Rules address the question, and courts disagree. *See Pac Sun*, 2016 WL 4250681, at *5. The Objectors recognize that, in *Pac Sun*, this Court expressed agreement with *Stone Hedge* that, "because a Rule 3018 proceeding is meant to enfranchise claimants, there is an inconsistency in using the burden of proof rules that apply to objections to claims," although the Court ultimately found it unnecessary to decide the issue. *Id.*

30. The circumstances of this case, however, warrant placing the burden on Mr. Donovan. *Pac Sun* involved unliquidated class and PAGA claims, no objection to those claims had been filed, and the debtors conceded the prima facie validity of the proofs of claim for purposes of the motions. *Id.* at *3–5. Here, by contrast, Mr. Donovan filed a liquidated claim based on a written agreement, MII Aviation scheduled that claim as disputed, and the Debtors filed the Claim Objection in the ordinary course, well before solicitation. The concern that a claimant could be disenfranchised by a last-minute objection is therefore absent. Where, as here, an objection has been filed, "the burden of proof should be on the claimant to present sufficient evidence that it has a colorable claim capable of temporary evaluation." *In re Armstrong*, 294 B.R. 344, 354 (B.A.P.

10th Cir. 2003), aff'd, 97 F. App'x 285 (10th Cir. 2004); *see also In re Sandia Resorts, Inc.*, 557 B.R. 217, 220 (Bankr. D.N.M. 2016); *In re Experient Corp.,* 535 B.R. 386, 405 (Bankr. D. Colo. 2015).

31. Placing the burden on Mr. Donovan is also consistent with the Third Circuit's claim-allowance framework, under which a proof of claim is prima facie valid only if it "alleges facts sufficient to support a legal liability to the claimant," and "[t]he burden of persuasion is always on the claimant." *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173–74 (3d Cir. 1992). For the reasons set forth in Section A, the Donovan POC does not allege facts supporting any legal liability of MII Aviation and is not entitled to prima facie effect against it. As shown below, Mr. Donovan cannot carry his burden on any of the remaining issues.

## C. The Underlying Employment Agreement is Unenforceable Because it Does Not Satisfy the Massachusetts Statute of Frauds

32. The Motion should be denied because the underlying Employment Agreement that the Bonus Agreement purports to modify is not enforceable under the Massachusetts statute of frauds. Under the Massachusetts Statute of Frauds, "[n]o action shall be brought" upon an agreement that is not to be performed within one year of its making unless the agreement is in writing and signed by the party to be charged. M.G.L. c. 259, § 1. The Employment Agreement is for a term of four years and is not signed by any party, and certainly not the "party to be charged" as required by Massachusetts law.

33. The Employment Agreement itself is not attached to the Donovan POC. The Employment Agreement is attached as Appendix 2 to the *Objection and Response of Moshe Yanai, Party in Interest, to the Debtors' Objection to the Claim of Christopher R. Donovan, Sr. [D.I. 308], and Cross-Motion to Strike Scandalous Allegations and for Sanctions, a Cease-and-Desist Order, and Related Relief* [Docket No. 322]. In his Motion, Mr. Donovan states that the

Employment Agreement was "…executed by Mr. Yanai as Manager of the Company…" *See* Motion at ¶ 23. It was not. The Employment Agreement Mr. Donovan relies on was never executed by any party. Mr. Donovan himself did not sign the Employment Agreement. A true and correct copy of the Employment Agreement is attached hereto as Exhibit A.

34. In one of Mr. Donovan's omnibus, supplemental responses at Docket No. 341, Mr. Donovan concedes the Employment Agreement is unsigned. In paragraph 37 of the supplemental response at Docket No. 341, Mr. Donovan quotes the signature block of the Employment Agreement, noting that it is unsigned by Mr. Yanai, as manager for MII Aviation Services LLC. In paragraph 38(a) of the supplemental response at Docket No. 341, Mr. Donovan also concedes that the statute of frauds requires a writing to be signed. Instead of providing a signed agreement or showing that the Employment Agreement is signed or otherwise satisfies the statute of frauds, Mr. Donovan only states as his basis for why the Employment Agreement is enforceable is that Mr. Yanai has appeared in these cases, filed the Employment Agreement itself, and attests that Mr. Yanai authorized the compensation. None of that, even if true, can overcome the Massachusetts law requiring that the Employment Agreement actually be signed.

35. In his supplemental response at Docket No. 341, Mr. Donovan points to an email exchange between himself and Mr. Yanai, which includes negotiations of Mr. Donovan's employment terms. In Massachusetts, emails can satisfy the "writing" requirement of the statute of frauds, but that is not the end of the inquiry, because satisfying the writing requirement of the statute of frauds does not mean that an agreement by email is enforceable. *See K & K Dev., Inc. v. Andrews*, 103 Mass. App. Ct. 338, 350, 219 N.E.3d 306, 318 (2023). Instead, to be enforceable, an email exchange must include an intent to be bound. *See McCarthy v. Tobin*, 429 Mass. 84, 87,

706 N.E.2d 629 (1999) (parties' intent to be bound is the "controlling fact" in determining whether the agreement is enforceable).

36. There is no intent to be bound anywhere in the documents Mr. Donovan points to as supporting his claim. In the emails attached to Docket No. 341, Mr. Donovan offers an eleven-point list of employment terms, and then asks for Mr. Yanai's comment about those. That may be an offer, but it is not a manifest intent to be bound. A true and correct copy of these emails is attached hereto as Exhibit B.

37. Further, Mr. Donovan states that after receiving any comments from Mr. Yanai, Mr. Donovan "will get [the Employment Agreement] finalized" and Mr. Donovan "will start full time march [sic] 1, 2010 weather [sic] or not it is signed." *See* email from Mr. Donovan to Mr. Yanai dated February 10, 2010, at Docket No. 341-1. This, too, is not an intent to be bound by the agreement. Indeed, Mr. Donovan states he is going to start working regardless of whether the Employment Agreement is signed, so it does not matter if Mr. Donovan is bound by the agreement or not. On February 11, 2010, Mr. Yanai states "All is o.k. and approved." *See* email from Mr. Yanai to Mr. Donovan dated February 11, 2010, at Docket No. 341-1. The lack of a signed agreement, the lack of a signature on the part of Mr. Yanai (on behalf of himself or any entity), and the email itself coming from Mr. Yanai's email address of "yanai_moshe@the-credo-group.com" make it unclear on behalf of which entity (if any) that Mr. Yanai is attempting to approve the terms set forth in Mr. Donovan's email.

38. Mr. Yanai's one-line reply, "All is o.k. and approved," does not change the analysis. Massachusetts courts have stated "[n]ormally the fact that parties contemplate the execution of final written documents justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled." *See Tull v. Mister Donut Dev.*

*Corp.*, 7 Mass. App. Ct. 626, 630, 389 N.E.2d 447, 450 (1979). Here the parties clearly contemplated a final written document. Mr. Donovan states "Could you please comment and I will get it finalized by me in writing and we can sign it next time we are together…" *See* email from Mr. Donovan to Mr. Yanai dated February 10, 2010, at Docket No. 341-1. Therefore, there is a clear expression that the parties did not intend to be bound unless and until final terms were "finalized in writing."

39. Final terms were never settled, which confirms the inference that the parties did not intend to be bound. The Employment Agreement is undated, but the preamble states it is "dated as of this __ day of February 2010..." Mr. Donovan, in his February 10 email to Mr. Yanai states he will "start full time march [sic] 1, 2010, weather [sic] or not it is signed." *See* email from Mr. Donovan to Mr. Yanai dated February 10, 2010, at Docket No. 341-1. The Employment Agreement, however, states that "the period of Employee's employment under this Agreement shall commence on the date hereof…" meaning sometime in February 2010. By way of further example, the Employment Agreement contains a one-year noncompete clause, but the email exchange does not mention anything about a noncompete clause.

40. Even if the Court finds an intent to be bound, the email exchange does not comply with the Massachusetts statute of frauds because there is no signature of the party to be charged. Electronic signatures can comply with the statute of frauds in Massachusetts, but there is no electronic signature here that would comply with the Massachusetts statute of frauds. *See K & K Dev., Inc. v. Andrews*, 103 Mass. App. Ct. 338, 350, 219 N.E.3d 306, 318 (2023) ("The e-mail messages also bear the necessary electronic signatures as they originated from Eugene's e-mail account, *his signature appears in the exchange*, and he acknowledged at trial that he sent the messages.") (emphasis added). The court in *K&K* noted that an email signature satisfied the

Massachusetts statute of frauds requirement of a writing that is "signed by the party to be charged." Here, MII Aviation is the party to be charged, but Mr. Yanai's signature on behalf of MII Aviation, or any entity, for that matter, never appears in the email exchange.

41. Indeed, in the email exchange, neither Mr. Donovan nor Mr. Yanai even mentions MII Aviation. The second point in the eleven-point list notes that Mr. Donovan will "work out of the Norwood Office" of BEH. *See* email from Mr. Donovan to Mr. Yanai dated February 10, 2010, at Docket No. 341-1. The sixth point in the list states that Mr. Donovan will work to obtain a certification for BEH. The seventh point in the list states "Mr. Yanai is the sole owner of the company, Boston Executive Helicopters, and will pay Christopher Donovan … bonus of 8% of the companies yearly gross income after each year of operation…" The tenth point in the list states that any expenses incurred while performing duties for "Boston Executive Helicopters" will be reimbursed monthly. Thus, to the extent that this email exchange binds any entity, and it does not, Mr. Donovan and Mr. Yanai continuously refer to BEH, and never refer to MII Aviation. Thus, Mr. Donovan has a claim, if at all, against BEH and not MII Aviation.

### D. <u>The Bonus Agreement Does Not Incorporate the Employment Agreement Into its Terms</u>

42. Moreover, under Massachusetts law, a subsequent agreement that satisfies the statute of frauds can incorporate the terms of an initial agreement that does not, but "the language used in a contract to incorporate extrinsic material by reference ... must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history)." *NSTAR Elec. Co. v. Dep't of Pub. Utilities*, 462 Mass. 381, 394 (2012) (quoting *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir.

2008)). Simply because the Bonus Agreement states that it "modifies" the Employment Agreement does not incorporate the terms of the Employment Agreement into the Bonus Agreement.

43. The language of the Bonus Agreement that states it simply "modifies" the Employment Agreement merely acknowledges that the "referenced material is relevant." It does not "clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract," as required by the court's ruling in *NSTAR Elec. Co.*, *supra*. The use of the term "modifies" in the Bonus Agreement, without more, does not incorporate the terms of the Employment Agreement or make the Employment Agreement itself satisfy the statute of frauds.

44. The court in *NSTAR Elec. Co.* quotes *Northrop Grumman Info. Tech., Inc. v. United States*. The court in *Northrop Grumman*, in turn, stated that parties could avoid litigating the issue of incorporation by "adopting widely-used and judicially-approved language of incorporation, such as 'is hereby incorporated by reference' or 'is hereby incorporated as though fully set forth herein,' and by including specific and sufficient information identifying a particular document, such as the title, date, parties to, and section headings of any document to be incorporated." *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1346 (Fed. Cir. 2008). There is no language in the Bonus Agreement that states anything along the lines of "is hereby incorporated by reference," or "is hereby incorporated as though fully set forth herein." Either of those, according to the court in *Northrop Grumman* would have sufficed. Instead, neither exists, and thus the terms of the Employment Agreement cannot be incorporated into the Bonus Agreement.

45. To satisfy the statute of frauds, Mr. Donovan and Mr. Yanai would have needed to comply with the court's ruling in *NSTAR Elec. Co.* or physically attach the unsigned Employment Agreement to the Bonus Agreement, combining both documents into one. *See Roberts v. Enter.*

*Rent-A-Car Co. of Bos.*, 438 Mass. 187, 195, 779 N.E.2d 623, 629 (2002), citing the Restatement (Second) of Contracts § 132 comment c at 343 (1979) (document physically attached to signed writing is part of contract under Statute of Frauds). Mr. Donovan and Mr. Yanai did not physically attach the initial Employment Agreement to the Bonus Agreement, and thus that avenue to satisfy the Massachusetts statute of frauds is also foreclosed.

46. Both BEH and MII Aviation are Delaware limited liability companies. Section 10.04 of the BEH and MII Aviation operating agreements are titled "Applicable Law" and state "This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, including the Act, as interpreted by the courts of the state of Delaware, notwithstanding any rules regarding choice of law to the contrary." *See* BEH and MII Aviation operating agreements, both are attached as exhibits to Docket No. 341. As such, Delaware law applies to interpretation of their governance documents. *See* Del. Code Ann. tit. 6, § 18-1101, which states "A limited liability company agreement that provides for the application of Delaware law shall be governed by and construed under the laws of the State of Delaware in accordance with its terms."

47. Under United States and Delaware law, separate legal entities are presumed to be distinct. As a result, a parent entity is generally not liable for the obligations of its subsidiary, absent extraordinary circumstances such as veil piercing, alter ego liability, or an express assumption of the subsidiary's obligations. *See, e.g., United States v. Bestfoods*, 524 U.S. 51, 61, 118 S. Ct. 1876, 1884, 141 L. Ed. 2d 43 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."); *see also Gracey v. Albawardi*, No. 2024-0394-LWW, 2024 WL 5116368, at *5

(Del. Ch. Dec. 13, 2024), *aff'd*, 345 A.3d 934 (Del. 2025) ("A subsidiary is presumptively 'a separate and distinct entity from its parent corporation.'").

48. The Delaware Limited Liability Company Act (the "**LLC Act**") codifies this principle, providing that "the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company." Del. Code Ann. tit. 6, § 18-303. The LLC Act recognizes only one exception: where a member or manager has agreed, in the LLC agreement or another agreement, to be personally liable for the LLC's obligations. *Id.*

49. Consistent with the LLC Act, Delaware courts have repeatedly reaffirmed the strong presumption of entity separateness. In *Wenske v. Blue Bell Creameries, Inc.*, the Court of Chancery held that a plaintiff's desire to hold a parent company liable for its subsidiary's contractual obligations does not justify disregarding the corporate form, emphasizing that Delaware law presumes the separate legal existence of affiliated entities. *Wenske v. Blue Bell Creameries, Inc.*, No. CV 2017-0699-JRS, 2018 WL 5994971, at *6 (Del. Ch. Nov. 13, 2018). Likewise, in *Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, the Court reaffirmed that it is a general principle of corporate law "deeply ingrained in our economic and legal systems" that a parent corporation is not liable for the acts of its subsidiaries, and that Delaware courts depart from this rule only in exceptional circumstances. *Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, No. 2022-0378-LWW, 2023 WL 5688392, at *4 (Del. Ch. Sept. 5, 2023).; *see also Gracey v. Albawardi*, No. 2024-0394-LWW, 2024 WL 5116368, at *5 (Del. Ch. Dec. 13,

2024), aff'd, 345 A.3d 934 (Del. 2025) (reiterating that Delaware law presumes respect for the corporate form, that a subsidiary is a separate and distinct legal entity from its parent, and that persuading a Delaware court to disregard that separateness is a difficult task).

50. Here, the Bonus Agreement bases bonus payments on BEH's financial performance, concerns services that have been or will be rendered to BEH, and contemplates payment by BEH. Mr. Donovan identifies no provision requiring MII Aviation (or Michal International Investment LLC ("**MII**")) to satisfy BEH's obligations and identifies no guaranty, assumption agreement, or other basis for imposing liability on MII Aviation or MII. Further, Mr. Donovan has not alleged facts that sufficiently support any viable theory of liability against MII Aviation or MII. Mr. Donovan has not set forth any facts showing fraud or that BEH is a mere instrumentality or alter ego of its owner, MII Aviation (or, in turn, that MII Aviation is a mere instrumentality or alter ego of MII), as would be required to pierce the corporate veil. *See In re Broadstripe, LLC*, 444 B.R. 51, 102 (Bankr. D. Del. 2010) (piercing corporate veil is permitted "where there is fraud or where [it] is in fact a mere instrumentality or alter ego of its owner."). To prevail on this claim, a "plaintiff must show (1) that the companies 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness ... [is] present.'" *Id*. Mr. Donovan has not pleaded any facts that would meet both prongs, and thus MII Aviation faces no liability for the Employment Agreement or the Bonus Agreement.

51. Accordingly, even if a valid contractual claim exists, it lies solely against BEH and not against MII Aviation or MII. Paragraph 41, *supra*, shows multiple instances of the email exchange between Mr. Donovan and Mr. Yanai where BEH is mentioned, but MII Aviation is not mentioned at all.

52. Additionally, and as stated above, the Bonus Agreement is avoidable as a fraudulent transfer. The Bonus Agreement also fails as against MII Aviation for lack of consideration, so the Bonus Agreement cannot serve to memorialize or salvage the unenforceable, unexecuted Employment Agreement with respect to Mr. Donovan's claims against MII Aviation.

### E. <u>The Employment and Bonus Agreement are Subject to Heightened Scrutiny Pursuant to the Entire Fairness Standard, and Neither Agreement Can Meet that Standard</u>

53. As a further alternative ground for denying the Motion, the Bonus Agreement is subject to heightened scrutiny given Mr. Donovan's insider relationship with BEH. *See Pepper v. Litton*, 308 U.S. 295, 306, 60 S. Ct. 238, 245, 84 L. Ed. 281 (1939) ("[An officer, director, or stockholder's] dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein."). The Objectors do not ask the Court to adjudicate entire fairness on the merits at this stage. The point for Rule 3018 purposes is narrower: where, as here, the insiders who stood on both sides of the transaction bear the burden of proving its fairness and have offered nothing to carry it, the claim cannot be treated as likely to succeed, and its voting value should be fixed accordingly.

54. The Bonus Agreement is executed by Mr. Yanai as manager of BEH and manager of MII Aviation, and by Mr. Donovan individually and as manager of BEH. The Bonus Agreement is, on its face, an agreement between the Managers and the LLC. The unexecuted Employment Agreement contains signature lines for Mr. Yanai, as manager of MII Aviation, and Mr. Donovan. Since Mr. Yanai and Mr. Donovan are on both sides of each transaction, Mr. Donovan and Mr. Yanai must show the entire fairness of each transaction. *See William Penn P'ship v. Saliba*, 13

A.3d 749, 756 (Del. 2011) ("By standing on both sides of the transaction… they bear the burden of demonstrating the entire fairness of the transaction.").

55. To meet the entire fairness standard, Mr. Donovan and Mr. Yanai must show two things: fair dealing and a fair price. *Id*. "Fair dealing involves analyzing how the transaction was structured, the timing, disclosures, and approvals. Fair price relates to the economic and financial considerations of the transaction. We examine the transaction as a whole and both aspects of the test must be satisfied; a party does not meet the entire fairness standard simply by showing that the price fell within a reasonable range that would be considered fair." *Id*. (internal footnotes omitted). Mr. Donovan and Mr. Yanai have not shown either fair dealing or a fair price, and it is their burden to bear.

56. Arms'-length negotiations provide "strong evidence that the transaction meets the test of fairness." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1172 (Del. 1995) (quoting *Weinberger v. UOP. Inc.,* 457 A.2d at 709–10 n. 7). Mechanisms that can "replicate arm's-length negotiating include the use of a special committee and a majority-of-the-minority voting provision for stockholder approval." *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667, 702 (Del. 2023). Here, there were two managers of BEH, Mr. Yanai and Mr. Donovan, who created the Employment Agreement. There was no use of a special committee or majority-of-the minority voting provision. There has been no evidence provided of arms'-length negotiations that would show evidence of the Employment Agreement meeting the entire test of fairness.

57. The only thing Mr. Donovan has argued related to fairness of the Employment Agreement is that the manager of Tel Aviv Executive Helicopters ("**TEH**") has the same bonus provision in his employment agreement. *See* Docket No. 341 at ¶ 27. TEH is another closely held entity of Mr. Yanai. Mr. Donovan should not be allowed to use an agreement that is entirely in

Hebrew (and the uncertified translation of the same) between Mr. Yanai's closely held Israeli entity and an individual to show that the entire fairness test is satisfied. In any event, the agreement Mr. Donovan relies on is between TEH and the individual employee and/or the individual employee's own entity. *See* Docket No. 322, Appendix 3B (attaching what purports to be an employment agreement between TEH and Boaz Peleg "and/or Peleg Aviation, Ltd."). MII Aviation is not mentioned a single time in the employment agreement Mr. Donovan relies on. In addition, Mr. Donovan claims "The enterprise paid its two founding operators the same way, on both continents, in the same spring." *See* Docket No. 341 at ¶ 27. Both "founding operators" were not paid the same way. Regarding bonus compensation, the agreement between TEH and Boaz Peleg states that bonus compensation "shall be made at the beginning of each quarter for the preceding quarter thereof." *See* Docket No. 322, Appendix 3B, Section 7.4. The unexecuted Employment Agreement states the "bonus shall be paid to Employee forty-five (45) days after year-end." *See* Docket No. 322, Appendix 2, Section 4(c). The enterprise did not pay both operators the same way. One was paid a bonus every quarter, one was paid 45 days after year end.

58. The Bonus Agreement itself does not meet the entire fairness test, particularly the fair dealing prong. "[Fair dealing] embraces questions of *when the transaction was timed*, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) (emphasis added). The timing of the Bonus Agreement is illustrative. The Bonus Agreement was executed on January 8, 2025, just twenty days before Mr. Yanai was removed as manager of MII. MII owns 100% of MII Aviation, and in turn MII Aviation owns 100% of BEH. Mr. Yanai and Mr. Donovan realized Mr. Yanai was going to be removed as manager and have no further authority over MII and MII Aviation. Mr. Donovan and Mr. Yanai also realized the

unexecuted Employment Agreement had no operative effect and would not allow Mr. Donovan to receive the bonuses stated in the unexecuted Employment Agreement. Mr. Donovan and Mr. Yanai attempted to route the money to Mr. Donovan by executing the Bonus Agreement and retroactively increasing the bonus percentages.

59. Further clouding the fairness of the Bonus Agreement is that Mr. Yanai and Mr. Donovan agreed to increase the bonus percentage from 8% to 10% for the years 2012 through 2024, and each year thereafter. The Employment Agreement the Bonus Agreement purports to modify has bonus percentages of 8%, and the Bonus Agreement contains no explanation as to why the bonus percentage was retroactively increased. In Mr. Donovan's argument that the *Pepper* argument fails, he stated that the "compensation formula was fixed in February 2010." *See* Docket No. 341 at ¶ 46. According to the Bonus Agreement, the compensation formula was not fixed at all, since he and Mr. Yanai changed it, without explaining why in the Bonus Agreement.

60. However the Court allocates the burden of proof, the result is the same: Mr. Donovan should not be permitted to vote his claim. The Bonus Agreement obligates BEH, not MII Aviation; the Employment Agreement it purports to modify is unsigned and unenforceable under the Massachusetts statute of frauds; and Mr. Donovan and Mr. Yanai, who stood on both sides of each transaction and bear the burden of proving entire fairness regardless of how the Rule 3018 burden is allocated, have offered nothing to carry it. Accordingly, the Donovan POC should be temporarily allowed, if at all, at $0 for voting purposes.

**RESERVATION OF RIGHTS**

61. This Objection does not waive, and should not be construed as waiving, any other objection, defense, claim, or right of the Objectors with respect to the Motion or any other matter. The Objectors expressly reserve all objections and defenses. The Objectors further reserve the

right to amend or supplement this Objection should additional information become available, including through any discovery obtained in connection with this matter, at any time up to and including the hearing on the Motion. The Objectors also reserve all rights to assert any other claims, causes of action, objections, or defenses against Mr. Donovan as permitted under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and other applicable law.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Objectors respectfully request that the Court deny Mr. Donovan's Motion in its entirety, value Mr. Donovan's claim at $0 for voting purposes, and grant such other and further relief as is just and proper.

Dated: October 21, 2026
Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

/s/ *Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (DE Bar No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
E-mail: desgross@chipmanbrown.com

*Counsel to the Debtors and Debtors in Possession*

**GORDON REES SCULLY MANSUKHANI, LLP**

*/s/ Joseph E. Brenner*
Joseph E. Brenner (No. 6643)
1523 Concord Pike, Suite 202
Wilmington, DE 19803
Telephone: (302) 992-8955
Email: jbrenner@grsm.com

-and-

**CHAPMAN AND CUTLER LLP**

Eric Silvestri
320 South Canal
Chicago, Illinois
Telephone: (312) 845-3915
Email: silvest@chapman.com

*Counsel for Scintilla Fund LP*

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Brett D. Fallon*
Brett D. Fallon (DE Bar No. 2480)
Ryan M. Messina (DE Bar No. 6875)
222 Delaware Ave., Ste. 1410
Wilmington, DE 19801
Telephone: (302) 467-4200
brett.fallon@faegredrinker.com
ryan.messina@faegredrinker.com

**MCGUIREWOODS LLP**
Dion W. Hayes (admitted pro hac vice)
Morgan E. Mumford (admitted pro hac vice)
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-1061
dhayes@mcguirewoods.com
mmumford@mcguirewoods.com

-and-

Aaron G. McCollough (admitted pro hac vice)
Jory Berg (admitted pro hac vice)
77 West Wacker Drive
Suite 4100
Chicago, IL 60601-1818
Telephone: (312) 849-8100
amccollough@mcguirewoods.com
jberg@mcguirewoods.com

*Counsel to the Official Committee of Unsecured Creditors*